**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 1:17-cv-02230-MEH

JANET CHI, individually and on behalf of minor child, J.C.,
DAVID CHI, individually and on behalf of minor child, J.C.,
WEN-CHENG CHI,
SHIU-SHIA WU,
SHASHI RAJYAGOR, individually and on behalf of minor children, A.R. and S.R.,
DIVYESH RAJYAGOR, individually and on behalf of minor children, A.R. and S.R.,
NEAL LOY,
BRIENNE LOY,
ANTERIO KITTRELL, and
JOELLA KITTRELL,

    Plaintiffs,

v.

WEYERHAEUSER COMPANY,

    Defendant.

---

**PLAINTIFFS' MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT TO ASSERT CLAIMS FOR EXEMPLARY / PUNITIVE DAMAGES**

---

    Plaintiffs, Janet Chi, David Chi, Janet Chi and David Chi on behalf of their minor child, J.C., Wen-Cheng Chi, Shiu-Shia Wu, Shashi Rajyagor, Divyesh Rajyagor, Shashi Rajyagor and Divyesh Rajyagor on behalf of their two minor children, A.R. and S.R., Neal Loy, Brienne Loy, Anterio Kittrell and Joella Kittrell (hereinafter collectively "Plaintiffs"), by and through their attorneys, The Nelson Law Firm, LLC, hereby submit Plaintiffs' Motion for Leave to File Second Amended Complaint to Assert Claims for Exemplary / Punitive Damages (the "Motion"), and in support thereof, state as follows:

1

## CERTIFICATE OF CONFERRAL

Pursuant to D.C.COLO.LCivR 7.1(a), undersigned counsel certifies that he conferred in good faith with counsel for Defendant, Weyerhaeuser Company ("Weyerhaeuser") regarding this Motion. Weyerhaeuser's counsel has advised that it opposes the relief sought in the Motion.

## INTRODUCTION

This is a products liability case involving defective and dangerous floor joists (the "Joists") manufactured by Weyerhaeuser that were installed in over 2,400 newly-built homes in the United States, including approximately 1,000 new homes here in Colorado. Weyerhaeuser began developing the Joists in early 2016 and began shipping the Joists to residential homebuilders in early December 2016. Prior to putting the joists into the stream of commerce, Weyerhaeuser consciously and deliberately failed to prevent the off-gassing and dangerous formaldehyde emissions from the Joists and falsified safety information provided to the public regarding the safety of the Joists. Weyerhaeuser first began receiving numerous complaints that the Joists were emitting noxious and irritating gases in late-April of 2017. Upon learning of the issues with the Joists, rather than immediately notify homebuilders, potential purchasers, and the public, Weyerhaeuser closed ranks and continued to manufacture and sell the Joists, while at the same time feverishly tinkering with the chemical coating formula on the Joists. Between late-May and early-July of 2016, long after Weyerhaeuser was aware that the Joists were defective and dangerous, each of the Plaintiffs in this lawsuit purchased and/or moved into homes containing the Joists.

In addition, Weyerhaeuser failed to conduct the requisite testing to ensure the Joists were safe before placing them into the stream of commerce. One of Plaintiffs' disclosed experts,

Warren Harris, a senior forensic chemist, has conclusively determined that Weyerhaeuser understood the dangers associated with formaldehyde exposure and intentionally failed to ensure the Joists were safe prior to distributing the Joists into the marketplace for the ultimate use by consumers. *See* Exhibit A: Harris Report at Sec. 3.3.3 – 3.3.21; *see also* WY95_0038835 and WY95_000038936 pages 1 and 2 of Exhibit B.

Plaintiffs are now in the possession of evidence that clearly demonstrates the following: (1) To save money and maximize profits, Weyerhaeuser intentionally manufactured the Joists without conducting adequate research, development, and testing, misrepresented the safety of the Joists, and sold the Joists into the stream of commerce with willful and wanton disregard for the rights and safety of others, including Plaintiffs; and (2) Weyerhaeuser had actual knowledge of the defective and dangerous condition of the joists well before Plaintiffs purchased homes that contained the Joists, and despite having that knowledge, deliberately chose to conceal the information from Plaintiffs. As such, Plaintiffs, by this Motion, seek to file a Second Amended Complaint to include claims for punitive damages, as permitted by C.R.S. § 13-21-102(1)(a).

## LEGAL AUTHORTY

After the deadline for the amendment of pleadings established by a scheduling order has expired, a party seeking leave to amend "must demonstrate (1) good cause for seeking modification under Fed. R. Civ. P. 16(b)(4) and (2) satisfaction of the Rule 15(a) standard" for amending pleadings. *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1247 (10th Cir. 2015) (*quoting Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1240 (10th Cir. 2014)).

Fed. R. Civ. P. 16(b)(4) allows modification of a scheduling order "only for good cause and with the judge's consent." "Demonstrating good cause under the rule 'requires the moving

party to show that it has been diligent in attempting to meet the deadlines, which means it must provide an adequate explanation for any delay.'" *Strope v. Collins*, 315 F. App'x 57, 61 (10th Cir. 2009) (*quoting Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1205 n.4 (10th Cir. 2006)); *see Lehman Bros. Holdings Inc. v. Universal Am. Mortg. Co.*, 300 F.R.D. 678, 681 (D. Colo. 2014). "In practice, this standard requires the movant to show the scheduling deadlines cannot be met despite [the movant's] diligent efforts." *Gorsuch, Ltd.,* 771 F.3d at 1240 (quotations omitted). "Rule 16's good cause requirement may be satisfied, for example, if a plaintiff learns new information through discovery or if the underlying law has changed." *Id.* On the other hand, "[i]f the plaintiff knew of the underlying conduct but simply failed to raise tort claims, [ ] the claims are barred." *Id.*

Pursuant to Fed. R. Civ. P. 15(a)(2), the Court is to freely allow amendment of the pleadings "when justice so requires." The grant or denial of an opportunity to amend is within the discretion of the Court, but "outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Pursuant to Colorado law, a request for "exemplary damages . . . may not be included in any initial claim for relief" but rather may be asserted "by amendment to the pleadings only after the exchange of initial disclosures . . . and the plaintiff establishes prima facie proof of a triable issue." C.R.S. § 13-21-102(1.5)(a). In order to obtain exemplary damages, a plaintiff must prove that "the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct." C.R.S. § 13-21-102(1)(a). Pursuant to the statute, willful and wanton conduct "means conduct purposefully committed which the actor must have realized as dangerous, done

4

heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." C.R.S. § 13-21-102(1)(b). This definition has been interpreted to include "conduct that 'creates substantial risk of harm to another, and is purposely performed with an awareness of the risk and disregard of the consequences.'" *Messler* at 867 P.2d at 134, citing *Palmer v. A.H. Robins Co.*, 684 P.2d 187, 215 (Colo. 1984).

"Prima facie proof of a triable issue of exemplary damages is established by a showing of a reasonable likelihood that the issue will ultimately be submitted to the jury for resolution." *Stamp v. Vail Corp.,* 172 P.3d 437, 449 (Colo. 2007) (quotation omitted). "Such proof may be established through discovery, by evidentiary means, or by an offer of proof." *Id.* "Prima facie evidence is evidence that, unless rebutted, is sufficient to establish a fact." *Id.* The Supreme Court of Colorado has instructed that this is "a lenient standard." *Id.* at 450. In construing C.R.S. § 13-21-102 *et seq.*, the Colorado Supreme Court has held that that "[A] plaintiff should have an opportunity to test the merits of any claim for relief that is supported by the underlying facts of the case." *Stamp v. Vail Corporation*, 172 P.3d 437, 450 (Colo. 2007).

## ARGUMENT

**A.    Good cause exists for granting this Motion.**

C.R.S. § 13-21-102(1.5)(a) does not allow Plaintiffs to assert a claim for punitive damages in their initial pleading. The Rule and case law interpreting it contemplate that a party will need to engage in discovery before it is able to demonstrate prima facie proof of a triable issue of exemplary damages. Indeed, significant discovery has been ongoing since the commencement of this action, with the majority having taken place in the last six months.

The original deadline for joinder of parties and amendment of pleadings was November 29, 2017. *See* Exhibit C: Scheduling Order, Doc. #50 at 16. Weyerhaeuser did not produce its initial disclosure documents until March 2018 and since then, Weyerhaeuser has disclosed upwards of 200,000 pages of documents.[1] In addition to the Weyerhaeuser documents, Weyerhaeuser has produced tens of thousands of pages of documents it obtained through subpoenas *duces tecum*. Most recently, Weyerhaeuser produced approximately 19,000 pages of documents it obtained from homebuilder, Richmond American Homes.

Plaintiffs and their experts have spent several hundred hours diligently reviewing and analyzing the documents produced by Weyerhaeuser and wasted no time in beginning document review as soon as additional documents were produced. *See* Exhibit A: Harris Report at Sec. 2.3-2.4 (Harris indicating he reviewed approximately 177,000 documents in preparation of his report, including those produced by Weyerhaeuser on November 30, 2018). Now, after Plaintiffs have finally reviewed and analyzed all documents produced by Weyerhaeuser to date, Plaintiffs are able to demonstrate prima facie proof of a triable issue of punitive damages.

Given the immense amount of discovery that has had to take place and the current stage of the litigation—with discovery ongoing, the vast majority of depositions having not yet occurred, and no trial date set—the Court should find good cause exists to grant this Motion.

**B. Weyerhaeuser's manufacture and sale of the Joists, and its subsequent handling of information indicating the Joists were defective and dangerous, was attended by willful and**

---

[1] Weyerhaeuser's Initial Disclosures in March resulted in production of just 456 pages of documents. Later in March 2018, Weyerhaeuser produced approximately 10,000 more pages of documents. In June 2018, Weyerhaeuser produced approximately 100,000 more pages of documents. In July 2018, Weyerhaeuser produced approximately 20,000 more pages of documents. In August 2018, Weyerhaeuser produced approximately 5,000 more pages of documents. In October 2018, Weyerhaeuser produced approximately 8,000 more pages of documents. In November 2018, Weyerhaeuser produced approximately 6,000 more pages of documents. And just two weeks ago, Weyerhaeuser produced approximately 600 more pages of documents.

**wanton conduct and without regard to consequences, or of the rights and safety of others, particularly Plaintiffs.**

The joists were called TJI® Joist with Flak Jacket® GEN-4 Protection (herein referred to as the "Joists"). The Joists were manufactured with a fire-retardant coating applied to the exterior; this coating is what is known as "Flak Jacket® GEN-4 Protection." The coating was comprised of roughly 64% urea-formaldehyde resin. *See* WY95_0139634 page 3 of Exhibit B. Formaldehyde is a toxic gas that is slightly heavier than air and has a pungent, irritating odor even at concentrations as low 1 part per million (ppm). *See* Exhibit A: Harris Report at Sec. 3.1.1; *see also* Exhibit D: Toxicology Assoc. Report, Borgmann at p. 16. Exposure can result in headaches, skin and mucous membrane irritation, and respiratory problems such as bronchitis, pulmonary edema, or pneumonia. *See* Exhibit A: Harris Report at Sec. 3.1.1; *see also* Exhibit D: Toxicology Assoc. Report, Borgmann at p. 16. The International Agency for Research on Cancer (IARC) and the United States Department of Health and Human Services (DHHS) classify formaldehyde as a known human carcinogen, and therefore it is well known that exposure to formaldehyde can cause cancer. *See* Exhibit A: Harris Report at Sec. 3.1.2-3.1.3. All of the aforementioned information was available to and known by Weyerhaeuser in 2016 and 2017.

Within a division of Weyerhaeuser called "Product Engineering Codes & Standards" is a specific unit called "Chemistry Platform." *See* WY95_0137265 - WY95_0137273 pages of 4 through 12 of Exhibit B. The key activities undertaken by the Chemistry Platform are new product development and cost reduction. Weyerhaeuser identifies nine specific key product attributes the Chemistry Platform is tasked with achieving, not one of them having anything whatsoever to do with consumer safety. *See* WY95_0137269 page 8 of Exhibit B. Weyerhaeuser

also subjects the Chemical Platform to a very specific and structured "Innovation Process," which begins with identifying new product development opportunities. *See* WY95_0137269 page 8 of Exhibit B. The Innovation Process, which has 14 stages, is what Weyerhaeuser's chemical products, such as the coating on the Joists, go through from inception of the product idea to introduction into the marketplace. Stage 13 of the Innovation Process is "Practice on a limited scale commercially, validate ability to safely make money, confirm customer acceptance and search for new failure modes (might need to recycle again)." *See* WY95_0137270 page 9 of Exhibit B.

In 2016, in response to increased market competition and revisions in the International Residential Code, Weyerhaeuser decided to develop a new generation of the Flak Jacket protection, "Gen 4," which would ultimately become the Joists out of which this lawsuit arises. The development of the new coating product for the Joists was a competitive race against Louisiana Pacific, Boise Cascade, and Hexion, each of which was attempting to introduce similar products to the market. *See* WY95_0007750 to WY95_0007753 page 13 through 16 of Exhibit B. Weyerhaeuser assembled a team of executives, engineers, and chemists to be responsible for bringing the Joists into production (the "FJ4 Team"). Many members of the FJ4 Team were members of the Chemistry Platform unit. The FJ4 Team's three primary objectives were to reduce costs of manufacturing, increase profitability, and get the Joists to market as quickly as possible. *See* WY95_0135829 page 17 of Exhibit B.

During 2016, Weyerhaeuser was aggressively working to equip a Weyerhaeuser-owned facility located in Simsboro, LA (the "Simsboro Plant") for the production of the Joists. One of the manufacturing cost-saving strategies employed by Weyerhaeuser was having all chemicals

8

shipped directly to the Simsboro Plant where the coating formulas would be prepared in-house, as opposed to ordering the coating formulas from highly specialized outside companies that would prepare them and ship them to Weyerhaeuser. *See* WY95_0137312 page 32 of Exhibit B.

As Weyerhaeuser was testing formula batches at the Simsboro Plant, the FJ4 Team was experiencing significant and ongoing problems with the formaldehyde resin it was using in the coating formulation. *See* WY95_0139284 page 36 of Exhibit B. Specifically, the FJ4 Team was experiencing problems with the viscosity (thickness) of the formaldehyde resin, which they were associating with the age of the resin. *See* WY95_0139218 page 37 of Exhibit B. Increased viscosity levels were being noted in resin batches that were only one day old. The Simsboro Plant even described batches of the formaldehyde resin as being hard as bricks. The FJ4 Team was also associating the age of the formaldehyde resin with coagulation issues that had been occurring and causing problems with the application. *See* WY95_0085127 page 38 of Exhibit B. The FJ4 Team contacted the supplier of the formaldehyde resin regarding viscosity issues and shipment delays and the supplier responded, in part, by stating that the pH levels of the resin change over time and if shipments of resin were not delivered timely, the pH levels would be different than intended. This same supplier would later tell the FJ4 Team something it should have already known and understood—that the pH levels were directly related to viscosity and that if viscosity was a problem, it was because the pH levels were incorrect. *See* WY95_0139289 page 39 of Exhibit B.

In line with Stage 13 of the Innovation Process, just 90 days prior to Weyerhaeuser's first shipment of Joists, the FJ4 Team determined it would not allocate any further resources to ensuring the formaldehyde emissions would be at safe and approved levels, but rather it would

begin manufacturing and selling the Joists and try to fix the issue for the next generation of the product. *See* Exhibit A: Harris Report at Sec. 3.3.15; *see also* WY95_0038936 page 43 of Exhibit B. In November 2016, while the FJ4 Team was still having problems with formaldehyde emissions, they understood that the pH levels of the formaldehyde resin were extremely important to the neutralization of the formaldehyde resin during the manufacturing process. *See* WY95_0139362 page 44 of Exhibit B. Despite knowing formaldehyde emissions were still unacceptable and understanding likely reasons why, the FJ4 Team proceeded towards production as quickly as possible.

On November 28, 2016, the Simsboro Plant sent an email stating that it was running out of joists with Flak Jacket Gen 2 coating and that it would be unable to fulfill two orders scheduled to be shipped to Denver, Colorado. *See* WY95_0138148 page 45 of Exhibit B. The email went on to state that the Simsboro Plant would be ready to begin production of the Joists by December 8, 2016 and would work the weekend (December 9-11) to catch up on production of orders, including those being sent to Denver.

On December 7, 2016, Weyerhaeuser began manufacturing sellable Joists at the Simsboro Plant. *See* WY95_0137868 page 46 of Exhibit B. Despite the Joists being sold into the marketplace at this time, the coating formula was still being revised and key decision-makers on the FJ4 Team were not even aware which formula was being used for production. *See* WY95_0139630 page 49 of Exhibit B. The Simsboro Plant was even using outdated formula cards, a mistake which was admitted to introduce potential for errors. See WY95_0139632 page 44 of Exhibit B. Two weeks prior to announcing sellable production of Joists, members of the FJ4 Team had email dialogue stating "[N]ote that we still don't have all of the questions

10

answered, such as VOC/formaldehyde emission levels, etc." *See* WY95_0138081 page 51 of Exhibit B.

On December 8, 2016, the FJ4 Team discussed additional testing, approvals, and the Safety Data Sheet ("SDS") for the Joists. *See* WY95_0138547 page 52 of Exhibit B. Also on December 8, 2016, the leader of the FJ4 Team sent an email to Frank Cerechini, Weyerhaeuser's head of Industrial Hygiene and Occupational Health, stating that "the timeline on multiple aspects of this project have been accelerated and we are really scrambling to try to keep pace." *See* WY95_0099061 page 43 of Exhibit B. In this email, the FJ4 Team expressed concern that some of the newly-manufactured Joists would be shipped from the Simsboro plant directly to customers (such as those in Denver), which was not the original plan. Also in this December 8, 2016 email the FJ4 Team urged Mr. Cerechini to provide a draft of the SDS by the following week—at the same time that Joists were being manufactured and sold into the marketplace for use in residential home construction.

After Weyerhaeuser began producing the Joists, the FJ4 Team worked on revising a Technical Bulletin originally dated September 2015, with a new date of December 2016. *See* WY95_0138964 page 54 of Exhibit B. On the second page of this working draft of the Technical Bulletin, there is a section entitled "Coating—Health and Environmental Considerations," which contains numerous redlines and comments from members of the FJ4 Team. One of the questions in this section is "Does the product give off any gases during the life of the structure (such as formaldehyde)?" This question is highlighted and contains a comment from one of the FJ4 Team members which states "Some testing being done, but statement will likely need revision. Remove until we have a revised statement." The final Technical Bulletin created and distributed

by the FJ4 Team, also dated December 2016, completely removes the question/answer regarding off-gassing, which indicates either that the testing referred to had not been done, or that the testing had been done or that the testing results were intentionally omitted. *See* WY95_0139491 page 62 of Exhibit B.

On December 12, 2016, Weyerhaeuser issued its SDS for the Joists, wherein Weyerhaeuser's technical staff included statements admitting that formaldehyde is a human carcinogen and asserting that they had evaluated the formaldehyde emission rates of the Joists and found them to be below the significant risk level. *See* WY95_0001186 to WY_0001197 pages 66 through 77 of Exhibit B; *see also* WY95_0027927 to WY95_0027937 pages 78 to 88 of Exhibit B. The SDS further states that the Joists contain formaldehyde at a minimum concentration of 0.1% (1000 ppm) which is not subjected to Superfund Amendments and Reauthorization Act (SARA) Title Section 313 supplier notification requirements. *See* Exhibit A: Harris Report at Sec. 3.3.5; *see also* WY95_0001186 to WY_0001197 pages 66 through 77 of Exhibit B; *see also* WY95_0027927 to WY95_0027937 pages 78 to 88 of Exhibit B.

Between January 30, 2017 and March 28, 2017, correspondence between the FJ4 Team reveals Weyerhaeuser was experiencing a variety of problems with the Joist coating system that slowed production and required re-formulating and testing the coating. The problems included coagulation of the uncured paint during production, paint delaminating from weather exposed I-joists, and discoloration problems. *See* Exhibit A: Harris Report at Sec. 3.3.7; *see also* WY95_0007411 page 89 of Exhibit B, WY95_0007750 page 13 of Exhibit B, WY95_0007552 page 92 of Exhibit B, WY95_0007779, WY95_0007780, and WY95_0007789 pages 105 through 107 of Exhibit B. Other problems in February 2017 included questions regarding the

adequacy of the SDS for the Joist top coat by an environmental consultant working for Simsboro Coating Service who claimed the Section 15 (*Regulatory Information*) was not in compliance OSHA requirements. *See* Exhibit A: Harris Report at Sec. 3.3.7; *see also* WY95_0027966 to WY95_0027970 pages 108 through 112 of Exhibit B.

On April 29, 2017, at the latest, Weyerhaeuser's technical staff first received reports of irritant odors associated with the Joists inside newly constructed homes. These initial reports were from a homebuilder in New Jersey. Three days later on May 2, 2016, Weyerhaeuser personnel visited an affected home and collected samples from the subject Joists. The samples were reportedly sent to Weyerhaeuser's Technical Center Laboratory and the issue was discussed with Weyerhaeuser's chemists. *See* Exhibit A: Harris Report at Sec. 3.3.8; *see also* WY95_0000002 page 113 of Exhibit B, WY95_ 0000021 page 116 of Exhibit B, and WY95_ 0000641 page 117 of Exhibit B.

On May 2, 2017, the same day Weyerhaeuser personnel were collecting the samples from an affected home in New Jersey, Weyerhaeuser's technical staff prepared a *Proposed Protocol for Coating Arcadia Webstock with Flak Jacket GEN-4 Formulations and Testing for Formaldehyde Emissions*. The May 2, 2017 date on the formaldehyde emission testing protocol establishes that Weyerhaeuser immediately understood that the Joists in the affected homes were emitting formaldehyde. *See* Exhibit A: Harris Report at Sec. 3.3.9. The preparation of the protocol also substantiates that the Joists had not been properly evaluated for formaldehyde as stated in the respective SDS. *See* Exhibit A: Harris Report at Sec. 3.3.9.

On May 19, 2017, Weyerhaeuser proceeded with the preparation of a letter to the homebuilder in New Jersey, which was issued on June 2, 2017. *See* WY95_0000016 to

WY95_0000023 pages 118 through 125 of Exhibit B. Weyerhaeuser's asserted that the odors were temporary and the result of an inadequate and unintended application of the topcoat of the Joists. These representations were untrue and deceptive since the quality and thickness of the topcoat could have been easily discerned and because the Joists were not properly tested for formaldehyde emissions. *See* Exhibit A: Harris Report at Sec. 3.3.11.

On July 6, 2017, Weyerhaeuser issued a statement to dealers, distributors, and builders notifying that all shipments of the Joists were being suspended while Weyerhaeuser investigated irritant odor problems. *See* WY95_0000407 page 126 of Exhibit B. Weyerhaeuser's request to halt shipments of the Joists was issued two months after Weyerhaeuser first became aware that the Joists were defective and emitting dangerous levels of formaldehyde. *See* Exhibit A: Harris Report at Sec. 3.3.15. On July 18, 2017, Weyerhaeuser issued a press release stating the Joists were defective and emitting dangerous levels of formaldehyde. *See* WY95_0000697 and WY95_0000698 pages 127 and 128 of Exhibit B. This was the very first time Weyerhaeuser notified the public of the issue. Had Weyerhaeuser notified the public in May 2017, none of the Plaintiffs in this case would have moved into their homes and been exposed to dangerous levels of formaldehyde. *See* Exhibit A: Harris Report at Sec. 3.3.18.

**B.  The issue of whether Weyerhaeuser's conduct was willful and wanton will ultimately be submitted to the fact finder for resolution and, as such, Plaintiffs' should be permitted to assert their claims for punitive damages.**

Weyerhaeuser's conduct was purposefully committed all while Weyerhaeuser was aware such conduct was dangerous, done heedlessly and recklessly, and without regard to consequences, or of the rights and safety of others, particularly Plaintiffs. C.R.S. § 13-21-102(1)(b). Weyerhaeuser was fully aware of the dangers associated with the chemicals it used in

manufacturing the Joists, particularly formaldehyde. As such, Weyerhaeuser was also aware that its conduct created substantial risk of harm to Plaintiffs and was purposely performed with an awareness of the risk and disregard of the consequences.'" *Messler* at 867 P.2d at 134, *citing Palmer v. A.H. Robins Co.*, 684 P.2d 187, 215 (Colo. 1984).

The evidence supporting Plaintiffs' allegations that Weyerhaeuser's conduct was willful and wanton is overwhelming. Plaintiffs have put forth evidence that clearly establishes Weyerhaeuser deliberately rushed the manufacture and sale of the Joists and in doing so intentionally falsified and concealed material facts regarding the safety of the Joists. The evidence further demonstrates that even after Weyerhaeuser was put on actual notice that the Joists were defective and emitting dangerous levels of formaldehyde, it deliberately chose to conceal this information from Plaintiffs, deceive Plaintiffs and the public, and unduly delay the dissemination of this information. Lastly, the evidence establishes that it was Weyerhaeuser's willful and wanton conduct that directly resulted in Plaintiffs unknowingly purchasing and then living in homes containing the defective and dangerous Joists.

The evidence cited in this Motion will be submitted to the fact finder, as will the opinions of Plaintiffs' expert, Mr. Harris, and, as such, this Court should grant the Motion and permit Plaintiffs to file a Third Amended Complaint asserting claims against Weyerhaeuser for punitive damages.

## CONCLUSION

In consideration of the foregoing, Plaintiffs respectfully request the Court GRANT their Motion and deem Plaintiffs' Third Amended Complaint, attached hereto as Exhibit C, filed *nunc pro tunc*. *See* Exhibit E—Plaintiffs' Second Amended Complaint.

DATED: January 24, 2019.

Respectfully Submitted,

**The Nelson Law Firm, LLC**

*/s/      Wyatt M. Cox*
Mark W. Nelson, #27095
Wyatt M. Cox, #46679
Colleen S. Nelson, #36942
1740 High Street
Denver, Colorado 80218
Telephone: 303-861-0750
Facsimile: 303-861-0751
mark@nelsonlawfirm.net
wyatt@nelsonlawfirm.net
colleen@nelsonlawfirm.net
ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2019, I electronically filed the foregoing with the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Craig M. J. Allely, #17546
Daniel Graham, #45185
Alexander Bailey, #45219
1900 Sixteenth Street, Suite 1400
Denver, CO 80202-5255
CAllely@perkinscoie.com
dgraham@perkinscoie.com

*/s/ Ansley Smith*
Ansley Smith