

December 12, 2018


Mr. Mark Nelson
The Nelson Law Firm, L.L.C.
1740 High Street
Denver, CO  80218


Re:    Plaintiffs v. Weyerhaeuser Company
       TJI® Joist with Flak Jacket® GEN-4 Protection
       JH File No.:    1A3171001


Dear Mr. Nelson:

JENSEN HUGHES was retained to review discovery response documents, *Requests for Production* (RFPs), provided via the Nelson Law Firm L.L.C.  from the Weyerhaeuser Company.  The objective of this ongoing review was to present our findings and observations regarding Weyerhaeuser's development, production and remediation of a fire-resistant coating on their wooden I-joist products that were emitting formaldehyde vapors.   The subject product was designated as TJI® Joist with Flak Jacket® GEN-4 Protection.

Due to new findings based on additional information, this expert disclosure report supersedes our earlier expert disclosure reports dated July 31, 2018 and September 26, 2018.

Pursuant to your request, JENSEN HUGHES has prepared the attached expert disclosure report during this ongoing investigation. If you have any questions concerning this report, please contact me at (425) 775-5550.



Respectfully submitted by:                    Respectively reviewed by:


Warren F. Harris                              Daniel V. Joyce, PE
Senior Forensic Chemist                       Senior Forensic Engineer
JENSEN HUGHES                                 JENSEN HUGHES

O: +1 425-775-5550
F: +1 425-775-0900

23109 55th Avenue West
Mountlake Terrace, WA 98043 USA

jensenhughes.com

**Exhibit 34**

Exhibit A

# PLAINTIFFS V. WEYERHAEUSER COMPANY
# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
# Civil Action No. 17-cv-02230-PAB-MEH

### December 12, 2018

JENSEN HUGHES File No. 1A3171001

### Report* Prepared by:

*[signature]*

**Warren F. Harris, BS, PI**
**Senior Forensic Chemist**

### Technical Review by:

*[signature]*

**Daniel V. Joyce, PE**
**Senior Forensic Engineer**

*Due to new findings based on additional information, this expert disclosure report supersedes our earlier expert disclosure reports dated July 31, 2018 and September 26, 2018.

O: +1 425-775-5550
F: +1 425-775-0900

23109 55th Avenue West
Mountlake Terrace, WA 98043 USA

jensenhughes.com

# TABLE OF CONTENTS

1.0     Synopsis ........................................................................................................ 4

2.0     Scope of Work .............................................................................................. 4

3.0     Analysis Items .............................................................................................. 4

4.0     Summary of Opinions .................................................................................. 18

5.0     Curriculum Vitae .......................................................................................... 23

6.0     Testimony List ............................................................................................. 24

7.0     Trial Exhibits ................................................................................................ 25

8.0     Cost of JENSEN HUGHES' Investigation ................................................. 25

**Plaintiff's v. Weyerhaeuser Company**                                    P a g e | 4
US District Court for The District of Colorado                    17-cv-02230-PAB-MEH
JENSEN HUGHES File No. 1A3171001                                  December 12, 2018

## 1.0   SYNOPSIS

In December of 2016, the Weyerhaeuser Company initiated production of a wooden flooring I-joist product designated as TJI® Joist with Flak Jacket® GEN-4 Protection.  The production of the I-joists included the application of a fire-resistant coating system designated as Flak Jacket® GEN-4 Protection.  Reportedly, in or about April 2017, the first newly constructed homes to incorporate the subject joists were completed, and by the end of the month, the new and perspective homeowners were complaining of irritant odors associated with exposed joists in their basements. Weyerhaeuser personnel were immediately informed of the issue. By July 6, 2017, and through continuing construction and surmounting complaints, Weyerhaeuser acknowledged the irritant odors to be the result of formaldehyde emissions. This prompted Weyerhaeuser to notify dealers, distributors and builders to cease distribution and stop using the subject joists.  Weyerhaeuser subsequently issued a remediation plan that gave the owners of the affected homes a choice of three different options: 1) remove and replace the joists, 2) paint over the joists with a specially formulated paint or 3) strip and repaint the joists. Each of these repair options included complimentary formaldehyde testing of the air inside the affected homes.

## 2.0   SCOPE OF WORK

On January 17, 2018 JENSEN HUGHES was retained by the Nelson Law Firm to perform the following tasks:

2.1   Conduct research on formaldehyde dangers and toxicity.

2.2   Conduct research on formaldehyde regulations.

2.3   Review of Request for Production (RFP) documents from Weyerhaeuser, designated as Bates Numbers WY95_000001 to WY95_0174586.

2.4   Review of Request for Production (RFP) documents from Weyerhaeuser, designated as Bates Numbers WY-CHI001574 to WY_CHI002450.

2.5   Reviewed claimant's discovery responses.

2.6   Conduct a review of defendant's responses to plaintiff's interrogatories.

## 3.0   ANALYSIS ITEMS

### 3.1   Research Formaldehyde Dangers and Toxicity

3.1.1   Formaldehyde is a toxic gas that is slightly heavier than air and has a pungent, irritating odor even at concentrations as low 1 part per million (ppm). Exposure can result in headaches, skin and mucous membrane irritation as well as respiratory problems such as bronchitis, pulmonary edema, or pneumonia. Children are more susceptible to the effects.[1]

---

[1] https://www.atsdr.cdc.gov/mmg/mmg.asp?id=216&tid=39

**Plaintiff's v. Weyerhaeuser Company**                          P a g e | 5
US District Court for The District of Colorado              17-cv-02230-PAB-MEH
JENSEN HUGHES File No. 1A3171001                          December 12, 2018

3.1.2   The International Agency for Research on Cancer (IARC) classified formaldehyde as a known human carcinogen in 2004.[2]

3.1.3   Formaldehyde was recognized by the United States Department of Health and Human Services as a carcinogen in 2011.[3]

3.1.4   In 1982, the US Consumer Product Safety Commission (CPSC) banned urea-formaldehyde foam insulation (UFFI) due to formaldehyde emission concerns, and the use of urea-formaldehyde foam and resins has been continuously decreasing as consumer awareness of dangers of formaldehyde toxicity has increased.[4]

**JENSEN HUGHES Comment:**   Evidence acknowledged by national agencies has established that formaldehyde emissions have been associated with dangerous respiratory conditions and the development of cancer with children being most susceptible.

3.2   **Research on Formaldehyde Regulations**

3.2.1   Prior to the recent EPA regulations for formaldehyde in wood products, California had product standards established by the California Air Resources Board (CARB). The standard, designated as CA 93120, was implemented in two phases, Phase I in 2009 and Phase II in 2010 that required product labeling identifying production as either CA 93120 compliant or CA Phase 2 compliant.   The standards set product emission target values for various products at 0.05 to 0.08 part per million (ppm) and cap values at 0.08 to 0.11 ppm. The required primary test method for third-party certifiers was designated as ASTM E1333 (*Standard Test Method for Determining Formaldehyde Concentrations in Air and Emission Rates from Wood Products Using a Large Chamber*), and a secondary method was set as ASTM D6007 (*Standard Test Method for Determining Formaldehyde Concentrations in Air and Emission Rates from Wood Products Using a Small Chamber).*[5]

3.2.2   New formaldehyde regulations (Title VI), which are identical to the California regulations, take effect on December 12, 2018. These regulations were added to the EPA's Toxic Substances Control Act and requires that wood products will be labeled as TSCA Title VI compliant and that formaldehyde testing will be carried out by third-party certifiers. The EPA's Title VI Summary Notes state that prior to Title VI regulations, US manufacturers had a high rate of compliance with CA 93120 for formaldehyde emissions.[6]

3.2.3   The current OSHA formaldehyde standard 29 CFR1910.1048 protects workers exposed to formaldehyde. The permissible exposure limit is 0.75 ppm measured as an 8-hour time weighted average (TWA) with a short-term exposure limit of 2 ppm which is the maximum exposure during a 15-minute period.[7]

---

[2] http://www.iarc.fr/en/media-centre/pr/2004/pr153.html).
[3] (https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/formaldehyde/formaldehyde-fact-sheet).
[4] https://www.cdc.gov/nceh/ehhe/trailerstudy/pdfs/08_118152_compendium-for-states.pdf
[5] https://www.regulations.gov
[6] https://www.epa.gov/formaldehyde/formaldehyde-emission-standards-composite-wood-products
[7] https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_id=10075&p_table=STANDARDS

**Plaintiff's v. Weyerhaeuser Company**
US District Court for The District of Colorado
JENSEN HUGHES File No. 1A3171001

P a g e | 6
17-cv-02230-PAB-MEH
December 12, 2018

3.2.4   Information obtained from the United States Product Safety Commission's (CPSC) website includes several federal laws administered and enforced by the CPSC.  One such law, identified as 15 U.S. Code §1263- *Prohibited Acts,* states that the act of introduction or delivery for introduction into interstate commerce of any misbranded hazardous substances or banned substance is prohibited. This statute under the Federal Hazardous Substances Act (FHSA) covers products that during a reasonably foreseeable purchase or use may be brought into a place where people live.[8]

3.3   **Weyerhaeuser's RFP Review (Presented in Chronological Order)**

**Pre-Production Phase**

3.3.1   Between 2012 and 2015, local code jurisdictions started to adopt the 2012 International Residential Code (IRC) Section R501.3 or the same 2015 IRC Section R302.13 (*Fire Protection of Floors*). This code, which permits the use of prefabricated wooden I-joists like Weyerhaeuser's TJI® Joists, states that exposed flooring joists are to be covered with ½-inch thick sheets of drywall for fire-resistance. However, the code includes an exception stating that the I-joists are permitted without drywall if they are determined to be fire-resistant when tested per ASTM E119 (*Standard Test Methods for Fire Tests of Building Construction and Materials*).[9]

**JENSEN HUGHES Comment:** The adoption of the code prompted manufacturers of wooden I-joists to develop a fire-resistant product that conformed to the code requirements of the 2012 IRC Section R501.3 or 2015 IRC Section R302.13 (*Fire Protection of Floors*).

3.3.2   In February 2016, the technical staff of Weyerhaeuser's TJI® Joists group, initiated the development of a fire-resistant coating system to be applied to their wooden I-joists with the objective of producing a fire-resistant wooden I-joist that would conform to the IRC.  The development of the new coating product, designated as Flak Jacket® Generation 4 was, in-part, a competitive race against Louisiana Pacific, Boise Cascade and Hexion.[10]   During the development of the TJI® Joist with Flak Jacket® GEN-4 Protection, the development of Generation 3 TJI® Joist was abandoned and never produced.

3.3.3   As early as February 18, 2016, the technical staff discussed formaldehyde emissions during a status meeting regarding the TJI® Joist with Flak Jacket® GEN-4 Protection. The group requested the support from Weyerhaeuser's Corporate Manager of Hygiene and Occupational Health and requested his recommendation of a testing service for formaldehyde emission testing.[11]

**JENSEN HUGHES Comment:**  Although the response to this request was not found during the document review, it appears this is the first documented indication of Weyerhaeuser's awareness that formaldehyde emissions will be a concern with the planned development of the Flak Jacket® GEN-4 Protection.

---

[8] https://www.cpsc.gov/Regulations-Laws--Standards/Statutes
[9] WY95_0007818 to WY95_0007835
[10] WY95_0007750 to WY95_0007753
[11] WY95_0061069

**Plaintiff's v. Weyerhaeuser Company**                                    P a g e | 7
US District Court for The District of Colorado                       17-cv-02230-PAB-MEH
JENSEN HUGHES File No. 1A3171001                                       December 12, 2018

3.3.4   February 25, 2016, appears to be the first in a continuing series of ten (10) pre-production Proposed Testing Protocols for testing prototype formulas of the TJI® Joists Generation 4 fireproof coating for formaldehyde emissions and other test parameters. The test results, which were presented in at least one of the Proposed Testing Protocols revealed that formaldehyde emissions were detected in all samples of the Flak Jacket® GEN-4 test coatings. Nearly all the protocols for formaldehyde emissions state that the samples shall be forwarded and tested for formaldehyde at Weyerhaeuser's Medium Density Fiberboard (MDF) facility.[12]

> **JENSEN HUGHES Comment:**   This finding further substantiates that approximately one year prior to production of the TJI® Joist with Flak Jacket® GEN-4 Protection, Weyerhaeuser's technical staff was aware that the product's materials contained formaldehyde and that testing was required to determine the levels of formaldehyde emissions. The methods and quality control data from the formaldehyde testing at Weyerhaeuser's MDF facility were not found during the document review.

3.3.5   Between March 3, and March 9, 2016, Weyerhaeuser's technical staff was corresponding between themselves and suggesting modifications to Proposed Testing Protocol series for testing formaldehyde levels in the Flak Jacket® GEN-4 Protection. The protocols were designated as PO22916 and PO30816 dated February 25 and March 8, 2016 and respectively.[13]

3.3.6   A May 9, 2016 correspondence from Weyerhaeuser's Medium Density Fiberboard (MDF) facility to the technical staff of the TJI® Joist group indicated that they had the ability to conduct formaldehyde testing per ASTM's *Standard Test Method for Determining Formaldehyde Concentrations in Air from Wood Products Using a Small-Scale Chamber.* The MDF group indicated to the TJI® Joist group that small chamber formaldehyde testing was necessary to comply with the CARB regulations (see item 3.2.1).  The technical staff of the TJI® Joist group acknowledged the benefit for testing the newly developed TJI® Joist with Flak Jacket® GEN-4 Protection as well as questioning the group regarding recent legislation in formaldehyde regulations.[14]

> **JENSEN HUGHES Comment:**  Correspondence between Weyerhaeuser's technical staff not only indicated their awareness of formaldehyde legislation, but also the benefit of testing the TJI® Joists with Flak Jacket® GEN-4 Protection for formaldehyde emissions during the product's development phase.

3.3.7   On May 23, 2016, the paint production and coating facility where the joists were to be coated (Simsboro Coating Services in Simsboro, Louisiana) requested information regarding the Flak Jacket® GEN-4 coating to acquire air quality permits.  In response, Weyerhaeuser provided a non-representative Material Safety Data Sheet (MSDS) indicating that the coating contains >0.1 percent formaldehyde. No reference to the product's urea formaldehyde-based coating formulation was presented.[15]

---

[12] WY95_0055276, WY95_0059898, WY95_0144364, WY95_0049220, WY95_0037664, WY95_0037693, WY95_0046429, WY95_0038455, WY95_0068181 and WY95_0040210
[13] WY95_0061047, WY95_0061048, WY95_0061060 and WY95_0061061
[14] WY95_0007172 to WY95_0007174
[15] WY95_0037320

**Plaintiff's v. Weyerhaeuser Company**
US District Court for The District of Colorado
JENSEN HUGHES File No. 1A3171001

P a g e | 8
17-cv-02230-PAB-MEH
December 12, 2018

**JENSEN HUGHES Comment:**   Weyerhaeuser appears to have misrepresented the requested permitting information by providing the MSDS for the existing formaldehyde free Flak Jacket® GEN- 2 product.

3.3.8    On June 13, 2016 communications between the technical staff revealed commentary that one of the proposed coating treatments in the Proposed Testing Protocol series for testing formaldehyde, designated as PO61716, will likely meet all their performance requirements including corrosion, formaldehyde emissions and cost.[16]

3.3.9    On July 20, 2016 a document titled *Evaluation of GEN-4 Flak Jacket Coating Options for TJI* was issued to the members of Weyerhaeuser's technical staff. A review of the document revealed a list of requirements for the joist product that included the statement "coated TJI should exhibit formaldehyde emissions that are compliant with CARB (0.11 ppm)."  A data table in the document shows that formaldehyde emission from eight (8) trial Gen 4 Flak Jacket coating tests exceeded the requirement.   The data table also revealed that Weyerhaeuser's formaldehyde emission tests revealed that when the Gen 4 Flak Jacket coating was top coated, it greatly reduced the formaldehyde emissions.[17]

**JENSEN HUGHES Comment:**   This document signifies that Weyerhaeuser had a formaldehyde emission requirement more than five (5) months before the non-compliant product was produced and at a time when a compliant formula had not been developed.

3.3.10   On July 11, 2016, Weyerhaeuser's East and Mid-Atlantic field representatives questioned Weyerhaeuser's Technical Staff regrading complaints of offensive odors and headaches from the Generation 2 TJI® Joists with Flak Jacket® in two newly constructed homes in New Jersey. The Technical Staff responds with a reference to their "84 Lumber Letter" that reportedly states, "the odor should will dissipate with time" and that "the only mitigation solution we have is paint with BIN shellac primer as indicated in the letter".  The technical staff claims that this problem previously occurred in Illinois and Indiana and that the odors are from the same components used in mattresses.  The technical staff further remarked that the absence of odor will be an essential attribute of Flak Jacket® GEN-4 Protection.[18]

**JENSEN HUGHES Comment:**   This correspondence revealed Weyerhaeuser's prior experience with consumer complaints of odors and the necessity to avoid this problem during the development of TJI® Joist with Flak Jacket® GEN-4 Protection.

3.3.11   Between July 19, and July 21, 2016, the technical staff learns that the first sets of formaldehyde emission tests on the Flak Jacket® GEN-4 coatings failed to meet the CARB criteria. The formaldehyde Protocol under which the samples would have been prepared is not cited in the communications.[19]

---

[16] WY95_0060953
[17] WY95_0012263 to WY95_0012294
[18] WY95_0049210 to WY95_0049215
[19] WY95_0163310 to WY95_0163312

**Plaintiff's v. Weyerhaeuser Company**                                    P a g e | 9
US District Court for The District of Colorado                          17-cv-02230-PAB-MEH
JENSEN HUGHES File No. 1A3171001                                      December 12, 2018

3.3.12   July 29, 2016 e-mail from the technical staff explained to Simsboro Coatings Inc. that the topcoat on the TJI® Joist with Flak Jacket® GEN-4 Protection, was intended to neutralize the acidity of the base coat overtime and to scavenge formaldehyde.[20]

3.3.13   August 3, 2016 appears to mark the first proposed protocol for producing full-sized TJI® Joists with Flak Jacket® GEN-4 Protection. The prototype included the W2280 base coat with the W11028 catalyst and was top coated with a paint formula designated as W20013. The Agenda/Notes on the following day revealed the technical staff finalized the formula for the paint system with a top coat approach to trap formaldehyde and neutralize acidity.[21]

3.3.14   On September 6, 2016, the technical staff sent a set of nine (9) coated test coupons to Weyerhaeuser's MDF plant for formaldehyde testing per protocol PO80716, in the Proposed Testing Protocol series for testing formaldehyde.  The results revealed that three of the coated coupons were at the CARB limit and the remaining 6 failed the emission requirement. The test method was not presented.[22]

3.3.15   On September 9, 2016, correspondence between Weyerhaeuser's technical staff and Simsboro Coating Services Inc. revealed an assertion that Weyerhaeuser cannot allocate further resources to investigate their concept solution of scavenging formaldehyde emissions, however this will be considered in the next generation (Gen 5) of TJI® Joists.[23]

**JENSEN HUGHES Comment:**  The statement suggests that three (3) months before the onset of the GEN-4 TJI® joist production, Weyerhaeuser exhausted its budget for producing a CARB compliant formaldehyde-free joist. The statement also implies that Weyerhaeuser's technical staff elected to continue with joist manufacturing without regard to minimizing the formaldehyde emissions.

3.3.16   On October 15, 2016 a member of Weyerhaeuser's Technical Staff responded to an inquiry from Weyerhaeuser's Regulatory Affairs Manager, regarding the applicability of the EPA's Formaldehyde Emissions Standards to the resin used in the Flak Jacket® coating. The response to the inquiry stated that the current Flak Jacket® formula is a formaldehyde-free urethane, however a request was made to discuss upcoming changes to the formula[24].

**JENSEN HUGHES Comment:**  The reviewed documents revealed no further information regarding the exhausted budget to develop CARB compliant product nor information regarding the telephone discussion with the Regulatory Affairs Manager.

3.3.17   On November 3, 2016 Weyerhaeuser's Agenda/Notes reveal the technical staff was ready to lock down the coating formulation and proceed with tests for fire, mechanical properties and corrosion at the same time manufacturing set-up and product marketing was making headway.[25]

[20] WY95_0038366
[21] WY95_0014731 to WY95_0014737 and WY95_0016805 to WY95_0016806
[22] WY95_0038835
[23] WY95_000038936
[24] WY95_0039602
[25] WY95_0015597

Plaintiff's v. Weyerhaeuser Company
US District Court for The District of Colorado
JENSEN HUGHES File No. 1A3171001

P a g e | 10
17-cv-02230-PAB-MEH
December 12, 2018

**JENSEN HUGHES Comment:** The agenda notes included no information regarding formaldehyde emission testing, nor has any information been uncovered since the onset of product development to reveal test formulas with satisfactory test results.

3.3.18   A November 18, 2016 revised Proposed Testing Protocol in the formaldehyde testing series Number P111316, titled Proposed Protocol for Making GEN 4 Formulations and Testing for Formaldehyde Emissions, included a data table indicating that all ten (10) test specimens in the test exhibited an acrid odor.[26]

**JENSEN HUGHES Comment:** This information indicates that one month before the onset of the GEN-4 TJI® joist production, the technical staff was aware and still struggling with the issue of odors.

3.3.19   On November 21, 2016, communications between the technical staff during the preparation of the Technical Bulletin's (Frequently asked Questions) for the TJI® Joists with Flak Jacket® GEN-4 Protection, revealed that questions regarding formaldehyde emissions had still not been answered. The formaldehyde question was thus omitted from the document which was released on December 2016. [27]

3.3.20   The newly developed Flak Jacket® GEN-4 Protection coating system was applied to the TJI® Joists by Simsboro Coating Services in Simsboro, Louisiana, and shipment of the product to builders for home construction began on or about December 7, 2016. The coating process, which was outlined in Weyerhaeuser's Manufacturing Standard dated December 2016, included the application of two individual coating layers on the wooden I-joists. The coating layers were designated as Flak Jacket® Base Coat and a Latex Topcoat (see Item 3.4).[28]

3.3.21   On December 7, 2016, at about the same time the first production run of TJI® Joists Flak Jacket® GEN-4 Protection were being produced, the technical staff was discussing using a more convenient and less expensive supplier of the additive (melamine) used to reduce formaldehyde emissions from the Flak Jacket coating.[29]

**Post Production Phase**

3.3.22   Since the onset of the production **TJI® Joists Flak Jacket® GEN-4 Protection** in early December and throughout the next 6-months, correspondence between the technical staff of the TJI® Joists group reveals Weyerhaeuser was experiencing a variety of problems with the Flak Jacket® GEN-4 Protection coating system that slowed production and required re-formulating and testing the paint. The problems included coagulation of the uncured paint during production, paint delaminating from weather exposed I-joists, discoloration and formaldehyde emissions.**[30]**

---

[26] WY95_0040588 to WY95_0040608
[27] WY95_0138081 and WY95_0137857
[28] WY95_0001148 to WY95_0001184 and WY95_0008099
[29] WY95_0040866 and WY95_0040867
[30] WY95_0007411, WY95_0007552, WY95_0007779, WY95_0007780 and WY95_0007789

**Plaintiff's v. Weyerhaeuser Company**                                P a g e | 11
US District Court for The District of Colorado                      17-cv-02230-PAB-MEH
JENSEN HUGHES File No. 1A3171001                                December 12, 2018

3.3.23   On or about December 12, 2016, Weyerhaeuser prepared a Safety Data Sheet (SDS) for the TJI® Joists with Flak Jacket® GEN-4 Protection.  In Section 11 (*Toxicity*), Weyerhaeuser's technical staff included a statement indicating that formaldehyde is a human carcinogen. In Section 15 (*Regulatory Information*) Weyerhaeuser asserts that they have evaluated the formaldehyde emission rates of the TJI® Joists with Flak Jacket® GEN-4 Protection and have found it to be below the significant risk level.  The SDS further states that the joists contain formaldehyde at a minimum concentration of 0.1% (1000 ppm), which is not subjected to Superfund Amendments and Reauthorization Act (SARA) Title Section 313 supplier notification requirements.[31]

**JENSEN HUGHES Comment:** In the SDS for the Flak Jacket® GEN-4, Weyerhaeuser acknowledges that the product contains formaldehyde and that formaldehyde is carcinogenic. The SDS also claims that the product has been evaluated for formaldehyde emission rates and determined to be safe, although the no mention of Weyerhaeuser's CARB compliance testing is referenced.  The absence of this information reveals the absence and/or the potential disregard for test results for CARB compliance.

3.3.24    As of December 19, 2016, the SDS for the TJI® Joists with Flak Jacket® GEN-4 Protection, was still being reviewed and edited by Weyerhaeuser's technical staff.  Correspondence amongst the group regarding the unsupported statements about "formaldehyde fumes" in the SDS received a favorable review from one member of the group.[32]

3.3.25   On December 29, 2016, the technical staff inquired about the results of formaldehyde emission tests on two sets of triplicate test formulations of the Flak Jacket® GEN-4 coating system. The samples, which were prepared under Formaldehyde Protocol P111316, were sent to the MDF Facility in Columbia Falls, Montana.  Results of the tests revealed none of the samples passed the CARB criteria for formaldehyde emissions. Results of the findings however provoked a conversation about remedying the problem by increasing the amount of melamine and possibly increasing the thickness of the top coat. [33]

3.3.26   January 26, 2017 Weyerhaeuser's technical staff issued Proposed Protocol P062717 that was designed to prepare six (6) test specimens with and without the Flak Jacket® GEN-4 coating and submit the samples to Weyerhaeuser's MDF plant for CARB formaldehyde testing. The coating system was designated as W108 Primer, W2401 Base coat, and W20043 Topcoat.[34]

**JENSEN HUGHES Comment**:  This post production testing protocol indicates again that the technical staff was aware of the formaldehyde issue and compliance criteria over a month after the product was being distributed to the end-users.

---

[31]  WY95_0001186 to WY_0001197 and WY95_0027927 to WY95_0027937
[32] WY95_0027979 and WY_0073464
[33] WY95_ 0163301 to 0163303
[34] WY95_0157014 to WY95_0157023

**Plaintiff's v. Weyerhaeuser Company**                          P a g e | 12
US District Court for The District of Colorado                  17-cv-02230-PAB-MEH
JENSEN HUGHES File No. 1A3171001                                December 12, 2018

3.3.27   In January 2017 at about the same time Weyerhaeuser personnel were submitting samples to their MDF facility for CARB formaldehyde testing, the technical staff were also submitting samples of green colored Flak Jacket® GEN-4 to a third-party laboratory (PFS-TECO) to be tested Per ASTM D6007 Small Scale Chamber Testing for Formaldehyde.  Results of the test show the formaldehyde emission was 3.058 ppm or approximately 30% higher than the Carb regulations.[35]

**JENSEN HUGHES Comment**:  This post production testing protocol indicates again that the technical staff was aware of the formaldehyde issue and aware that the product did not conform to CARB regulations after the product was being distributed to the end-users.

3.3.28   Other problems in February 2017 included questions regarding the inadequacy of the SDS for Flak Jacket® GEN-4 Protection top coat by an environmental consultant working for Simsboro Coating Service who claimed the Section 15 (Regulatory Information) was not in compliance OSHA requirements.[36]

3.3.29   On April 14, 2017 the technical staff was informed of multiple instances in Colorado where the fire protective coating on TJI® Joists with Flak Jacket® GEN-4 Protection was experiencing adhesion failure and/or was found to be either not coated or non-uniformly coated. This information was followed with discussions regarding field repairs included encasing the failed joists with drywall or applying a field paint.[37]

**JENSEN HUGHES Comment:** Production and performance difficulties experienced during and after the initial production of the TJI® Joists with Flak Jacket® GEN-4 Protection suggests again that the product's performance and safety was jeopardized by Weyerhaeuser's failure to complete prototype testing during the development phase.

3.3.30   On April 29, 2017, Weyerhaeuser's technical staff first received reports of irritant odors associated with the TJI® Joists with Flak Jacket® GEN-4 Protection inside newly constructed homes. These initial reports were from a homebuilder in New Jersey.  Three days later, on May 2, 2017, Weyerhaeuser personnel visited an affected home and collected samples from the subject I-joists. The samples were reportedly sent to Weyerhaeuser's Technical Center Laboratory, and the issue was discussed with Weyerhaeuser's chemists.[38]

**JENSEN HUGHES Comment:** Our review of the documents uncovered no evidence of testing the above-referenced samples.

---

[35] WY-CHI 002427 to WYCHI 002428
[36] WY95_0027966 to WY95_0027970
[37] WY95_0137412 to WY95_0137413
[38] WY95_0000002, WY95_ 0000021 and WY95_ 0000641

**Plaintiff's v. Weyerhaeuser Company**                    P a g e | 13
US District Court for The District of Colorado            17-cv-02230-PAB-MEH
JENSEN HUGHES File No. 1A3171001                          December 12, 2018

3.3.31   On May 2, 2017, the same day Weyerhaeuser personnel were collecting samples from the affected home in New Jersey, Weyerhaeuser's technical staff prepared a *Proposed Protocol for Coating Arcadia Webstock with Flak Jacket GEN-4 Formulations and Testing for Formaldehyde Emissions.*   The protocol, designated as P050317, outlines the preparation and testing of 27 sample coupons painted with a variety of candidate paint formulations, including the Flak Jacket® GEN-4 base coat, latex top coat and a field paint. The protocol states that after the coupons are cured for 21-days, they will to be sent to Weyerhaeuser's Columbia Falls, Montana MDF facility for formaldehyde testing.  The formulas and mixing schemes for the Flak Jacket® coating system, the candidate paint, and the application instructions are included in the protocol. Results presented in an updated protocol dated June 9, 2017 revealed the topcoat reduced formaldehyde emissions from the base coat by 44% and the use of the field paint reduced it to 63%. All samples were shown to be emitting formaldehyde. The test method and results from the MDF facility were not found during the preparation of this report. [39]

> **JENSEN HUGHES Comment:** The May 2, 2017 date on the formaldehyde emission testing protocol indicates Weyerhaeuser immediately understood that the TJI® Joists with Flak Jacket® GEN-4 Protection in the affected homes were emitting formaldehyde.  The preparation of the protocol also substantiates that the newly developed I-joist product had not been properly evaluated for formaldehyde as stated in the respective SDS (see Item 3.3.20 and 3.3.22).

3.3.32   On May 4, 2017 the technical staff had a conference call to focus on fact finding and possibly finding a solution to remedy the odor problem. One member suggested possibly painting over the joists with a commercially available primer**.[40]**

> **JENSEN HUGHES Comment:** This is the first documented effort of Weyerhaeuser's Technical Staff to address the formaldehyde odors on installed products.

3.3.33   May 7, 2017 a Proposed Protocol Testing Two Flak Jacket® GEN-4 Protection Coatings for physical performance testing using a basecoat that was modified for lower formaldehyde emissions.[41]

> **JENSEN HUGHES Comment:** This is one of the first documented efforts of Weyerhaeuser's Technical Staff to address the formaldehyde odors in the manufacturing phase.

3.3.34   On May 8, 2017 Weyerhaeuser personnel prepared another testing protocol, the *Proposed Protocol for Testing TJI Flak Jacket specimens with and without Field Paint for Formaldehyde Emissions*, designated as P051017. The protocol specified the formaldehyde test would be conducted by placing the 8 x 8-inch test specimens in bags with Chromair® formaldehyde badge. The candidate field paint formula in the protocol was designated as W20101.[42]

---

[39] WY95_0001489 to WY95_0001503 and WY95_0144363 and 0144364
[40] WY_0161433
[41] WY_0160418 to WY95_0160431
[42] WY95_0001509 to WY95_0001513

**Plaintiff's v. Weyerhaeuser Company**
US District Court for The District of Colorado
JENSEN HUGHES File No. 1A3171001

P a g e  | 14
17-cv-02230-PAB-MEH
December 12, 2018

**JENSEN HUGHES Comment:**  The date on the formaldehyde emission testing protocol indicates again that Weyerhaeuser was aware of the formaldehyde emissions in early May 2017, and they were already experimenting with a remediation Field Paint to reduce the irritant odors using formaldehyde spot tests.  It should be noted that although the protocol includes the formula for the Field Paint, designated as W20101, the RFPs also include several formula variations designated as W20101 Field Paint with the primary variable being the concertation of melamine powder which is used to scavenge formaldehyde emissions.[43]

3.3.35   On May 19, 2017, Weyerhaeuser personnel proceeded with the preparation of a letter to the homebuilder in New Jersey. The letter, which was issued on June 2, 2017, explained that although the irritant odors may be from other sources, their sampling revealed the irritant odors were from our TJI® Joists with Flak Jacket® GEN-4 Protection, as result of an inadequate application of the topcoat during the initial production of the joists.  The letter further explained that the topcoat was intended to react and neutralize volatile compounds and odors from the joists. Weyerhaeuser explained that the odor will dissipate over time; however, an immediate fix will be to paint the joists with their provided field paint.[44]

**JENSEN HUGHES Comment:** Weyerhaeuser's assertion to the homebuilder that the odors are temporary and the result of an inadequate application of the topcoat was deceptive and unfounded since the quality and thickness of the top coat could have been easily discerned and because Weyerhaeuser was aware that the joists were emitting formaldehyde and no evidence has been found to indicate that the joists had been tested and found to be CARB compliant.

3.3.36   On May 30, 2017, the claimants started to sequentially occupy newly purchased homes constructed with the TJI® Joists with Flak Jacket® GEN-4 Protection. The last of these homeowners was permitted to move in on July 13, 2017.

**JENSEN HUGHES Comment:**  Evidence shows that Weyerhaeuser's technical staff was aware that the TJI® Joists with Flak Jacket® GEN-4 Protection were defective and emitting formaldehyde at least one month prior to the Colorado claimants being permitted to occupy their new homes (see Item 3.3.31).

3.3.37   On June 5, 2017, Weyerhaeuser's technical staff responded to continuing pleas from the homebuilder in New Jersey regarding the irritant odors with the provision of the previously discussed SDS that included deceptive statements regarding the safe evaluation of the joists for formaldehyde subject joists (see Items 3.3.21, 3.3.22 and 3.3.24).[45]

**JENSEN HUGHES Comment:**  Although evidence indicates that Weyerhaeuser's technical staff was aware that the TJI® Joists with Flak Jacket® GEN-4 Protection were defective and emitting formaldehyde, the inquiring homebuilder in New Jersey was not truthfully informed.

[43] WY95_0001499, WY95_0001511, WY95_0001516 and WY95_0001525
[44] WY95_0000016 to WY95_0000023
[45] WY95_0000584 to WY95_0000590

**Plaintiff's v. Weyerhaeuser Company**                                    P a g e | 15
US District Court for The District of Colorado                            17-cv-02230-PAB-MEH
JENSEN HUGHES File No. 1A3171001                                          December 12, 2018

3.3.38   On June 7, 2017 Weyerhaeuser's technical staff acknowledges that this day marks the first time that formaldehyde tests on the TJI® Joists with Flak Jacket® GEN-4 Protection passed the formaldehyde emission (0.110 ppm) criteria outlined in CARB. Communications within the group revealed that in ten (10) triplicate panel tests, the sample determined to be CARB compliant were the result of adding melamine and urea to the base coat. Communications preceding these findings indicate that a final decision regarding the Flak Jacket® GEN-4 is due on June 13, 2016. The test results, which were provided by Weyerhaeuser's MDF Facility, and associated discussion do not reference the Formaldehyde Protocol under which the samples were prepared.[46]

**JENSEN HUGHES Comment:**   This information further supports our finding that Weyerhaeuser was aware that TJI® Joists with Flak Jacket® GEN-4 Protection were defective and emitting formaldehyde at elevations above CARB regulations since the onset of production.

3.3.39   On June 8, 2017 Weyerhaeuser's Technical Staff tabulated a list of priorities regarding the chemistry of the TJI® Joists with Flak Jacket® GEN-4 Protection. The list included activities directed toward formaldehyde emissions and code compliance.[47]

3.3.40   On or about June 13, 2017, Weyerhaeuser's technical staff produced the first batch of latex Field Paint intended to be applied over the top of the Flak Jacket® GEN-4 Protection coating system to further reduce emissions of the irritant odors. This formaldehyde scavenging formula, as indicated in the June 15, 2017 Protocol for the TJI® Flak Jacket® Field Application was designated as W20101.   Weyerhaeuser personnel also indicated that they must generate an SDS for the new Field Paint and conduct fire tests on joists with the field paint applied.[48]

**JENSEN HUGHES Comment:** As previously stated in Item 3.3.34, the RFPs revealed several formula variations of the formaldehyde scavenging Field Paint bearing the same numerical designation W20101 in the W20 series. The Field Paint formulas, which are like the Flak Jacket® GEN-4 top coat formula, also scavenges formaldehyde.

3.3.41   On July 6, 2017 Weyerhaeuser issued a cautionary statement to dealers, distributors and homebuilders that all shipments of the TJI® Joists with Flak Jacket® GEN-4 Protection be halted while irritant odors are being investigated.[49]

**JENSEN HUGHES Comment:** Weyerhaeuser's request to halt shipments of the TJI® Joists with Flak Jacket® GEN-4 Protection was issued two-months after the technical staff of the TJI® Joist group first became aware of that the I-joists were defective and emitting dangerous levels of formaldehyde in people's homes.

---

[46] WY95_0162183 to WY95_ 0162187 and WY95_ 0162192 to WY95_ 0162193
[47] WY95_0136977
[48] WY95_0000037 to WY95_0000042 and WY95_0001523 to WY95_0001525
[49] WY95_0000407

**Plaintiff's v. Weyerhaeuser Company**                                    P a g e | 16
US District Court for The District of Colorado                       17-cv-02230-PAB-MEH
JENSEN HUGHES File No. 1A3171001                                       December 12, 2018

3.3.42   On July 8, 2017 Weyerhaeuser issued another statement that they are working on testing several formulations of field paint to determine the most effective formula to reduce the formaldehyde emissions.[50]

3.3.43   On July 17, 2017 PFS TECO Laboratories, in Springfield, Oregon received a sample of Flak Jacket with Grey (W20115) Field Paint from Weyerhaeuser to be evaluated per ASTM D6007-14 (Small Chamber Test for Formaldehyde).[51]

**JENSEN HUGHES Comment**:  This small chamber formaldehyde test conducted by a third-party laboratory would have fulfilled the CARB and EPA's TSCA Title VI requirements and should have been included on the initial SDS as a proper evaluation for formaldehyde emissions (see items 3.2.1 and 3.2.2).

3.3.44   Between July and December of 2017 Weyerhaeuser's Technical staff continued to submit samples to PFS TECO Laboratories, in Springfield, Oregon to be evaluated per ASTM D6007-14 (*Small Chamber Test for Formaldehyde*). The samples appeared to be from a residence in Colorado, and other samples were reportedly coated green (original topcoat) or were coated with the W20115 Remediation Field Paint. Samples were submitted under the Protocol designations P073717 and P080317. The test reports revealed that the tests were repeated on the submitted sample at intervals of 7,14, 28, 42,56, and 70-days. Some samples were tested up to 120-days. In addition, a full-sized TJI® Joists with Flak Jacket® GEN-4 Protection with a grey-colored topcoat (Field Paint) were subjected to ASTM E1333 *(Large Scale Chamber Testing*) large scale chamber tests for formaldehyde under Weyerhaeuser protocol P0101917[52]

**JENSEN HUGHES Comment:**  This series of formaldehyde emission tests represent research and development efforts by Weyerhaeuser to test the ability of the W20115 Remediation Field Paint to scavenge formaldehyde and maintain emission levels below the CARB threshold for periods of 70 to 120-days.  This series of test also marks a period that Weyerhaeuser appeared to switch to a third-party testing laboratory for its research and development efforts rather than using their own in-house testing capabilities. The last tests were conducted in April 2018, and no information regarding formaldehyde emission tests of longer duration were found.

3.3.45   On January July 18, 2017 Weyerhaeuser released a public news release regarding the irritating odor from the TJI® Joists with Flak Jacket® GEN-4 Protection.[53]

**JENSEN HUGHES Comment**:  Weyerhaeuser's press release on July 18, 2018 occurred over 2-½ months after Weyerhaeuser knew that the TJI® Joists were off-gassing formaldehyde.  Had Weyerhaeuser notified the public in May 2017, none of the claimants involved in the Colorado lawsuits for which we have been retained would have been exposed to dangerous levels of formaldehyde after moving into their homes.

---

[50] WY95_0000181
[51] WY95_0006804
[52] WY-CHI 001574 to WY-CHI 00242 "Formaldehyde" Search
[53] WY95_0000697 and WY95_0000698

**Plaintiff's v. Weyerhaeuser Company**                                    P a g e | 17
US District Court for The District of Colorado                          17-cv-02230-PAB-MEH
JENSEN HUGHES File No. 1A3171001                                      December 12, 2018

3.3.46   On August 17, 2017, the revised TJI® Joists with Flak Jacket® GEN-4 Protection Scope of Work for Field Paint Remediation was issued by Weyerhaeuser.[54] The document indicates that the designated formula for the Field Paint is W20115.

>   **JENSEN HUGHES Comment:** This designation number indicates this formula is the 115th in the W20xxx series, which was found to have several variations bearing the same initial formula designation (see 3.4.2). The formula information on this W20115 Field Paint designation has not yet been identified in the RFPs.

3.3.47   On August 18, 2017, Weyerhaeuser initiated residential testing of interior air for formaldehyde emissions in homes constructed with the TJI® Joists with Flak Jacket® GEN-4 Protection. At this phase in the investigation, it was believed that the tested homes have been remediated.  The interior air sampling and sample testing was conducted across 13 states by third party industrial hygienists and subcontracted laboratories.  The testing included approximately 665 individual homes in Colorado, and the last recorded test date appeared to be January 12, 2018.[55] Additionally, according to Weyerhaeuser, 1,059 homes were constructed in Colorado with the TJI® Joists with Flak Jacket® GEN-4 Protection.

## 3.4   Paint System (Flak Jacket® GEN-4 Protection)

3.4.1   As indicated in Weyerhaeuser's May 2, 2017 *Proposed Protocol for Coating Arcadia Webstock with Flak Jacket GEN-4 Formulations and Testing for Formaldehyde Emissions*, Flak Jacket® Base Coat was revealed to be a two-part catalyzed formula designated as Part A (W2374) with the catalyst formula designated as Part B (W1113). A review of the formula components as presented in the protocols revealed the base coat is comprised of an approximate 70% mixture of urea formaldehyde wood glue and a styrene-acrylic emulsion with an additional 21% mixture of graphite and glass micro-beads.  The balance of the formula includes fire inhibitors, pigments, thickeners and hardeners.  The curing of the paint is catalyzed by with 4 to 1 mixture of tartaric acid and acrylic that is added to the basecoat at a ratio of approximately 1:6.

>   **JENSEN HUGHES Comment:** The urea formaldehyde wood glue, which is the primary component of the Flak Jacket® Base Coat, is designated as UF253A34 Composite Board Adhesive manufactured by Georgia Pacific. A review of the product's SDS indicates that although the product has a mild formaldehyde odor, the concentration of formaldehyde is below the hazardous reporting limit.[56]

3.4.2   The latex top coat, designated as Weyerhaeuser's Formula W20043, is presumed to be the Weyerhaeuser formula used in the Flak Jacket® GEN-4 Protection coating system since it was the only formula in the top coat series (W20xxx) that included an SDS.[57]  A review of the formula components reveals the green-colored top coat is comprised of 37% mixture of water and acrylic latex with 27% melamine powder (fire inhibitor/reactant), and the remaining 36% includes antimicrobial preservatives, fillers, pigments and thickeners.[58]

---

[54]https://www.weyerhaeuser.com/application/files/4815/1303/5967/Flak_Jacket_Remediation_Scope_of_Work_8.17.17.pdf
[55] WY95_0001842 to WY95_0006483
[56] WY95_0001314 to WY95_ 1325
[57] WY95_0001440 to WY95_0001445
[58] WY95_0001495 and WY95_0001204 to WT95_0001208

**Plaintiff's v. Weyerhaeuser Company**                                    P a g e | 18
US District Court for The District of Colorado                        17-cv-02230-PAB-MEH
JENSEN HUGHES File No. 1A3171001                                         December 12, 2018

**JENSEN HUGHES Comment:** As previously stated, in Item 3.3.12, this latex top coat was intended to reduce emissions of the irritant formaldehyde odors from the underlying products. In review of this top coat formula, it was revealed that the formulation includes melamine powder, which serves as a fire inhibitor, but which also can react with formaldehyde to form non-vapor-forming melamine formaldehyde. The effectiveness of the reaction is limited by the concentration of available melamine powder and the concentration of formaldehyde. Testing formula prototypes for formaldehyde emissions and time weighted performance of the melamine powder reactant is required to assure the absence of emissions.

3.4.3   Although the W20115 Remediation Field Paint formula reportedly distributed by Weyerhaeuser as the remediation paint has not yet been found in Weyerhaeuser's RFPs, multiple instances of variations to the Field Paint designated as W20101 revealed that Weyerhaeuser was experimenting with varying the concentration of melamine powder in the formula.

**JENSEN HUGHES Comment:** The W201xx series of Field Paint formulas appeared essentially identical to the original Flak Jacket® GEN-4 Protection topcoat with the exception that approximately half of the calcium carbonate filler, which comprises 0.2% of the formula, is replaced with melamine powder, which can absorb and react with formaldehyde gas.[59][60] Thus, Weyerhaeuser's proposed remedy appears to be a second coat of the original latex top coat, but with a little more melamine powder. Furthermore, the use of the melamine powder reactant in the original top coat formulation suggests prior knowledge of the need to inhibit formaldehyde emissions from the base coat.


## 4.0    SUMMARY OF OPINIONS

4.1   Conclusions stated in this report are based on a reasonable degree of engineering and scientific probability. We reserve the right to amend this report or provide a supplemental report as new information becomes available.

4.1.1   The dangers of formaldehyde emissions have long been recognized by national agencies as being toxic and associated with headaches and respiratory complications as well as being carcinogenic (see Item 3.1 of this report).

4.1.2   National agencies have recognized that children are more susceptible to the dangers of formaldehyde than adults (see Item 3.1).

4.1.3   California's regulations for formaldehyde emissions from wood products and the requirement for third-party testing was enacted in 2009, has been adopted by the EPA, and will take affect at the end of 2018 (see Item 3.2).

---

[59] WY95_0001543
[60] https://www.sciencedirect.com/topics/chemistry/melamine

**Plaintiff's v. Weyerhaeuser Company**    P a g e | 19
US District Court for The District of Colorado    17-cv-02230-PAB-MEH
JENSEN HUGHES File No. 1A3171001    December 12, 2018

4.1.4    Weyerhaeuser's development of the TJI® Joists with Flak Jacket® GEN-4 Protection was a competitive race to produce a fire-resistant I-joist to meet new building code requirements (see Items 3.3.1 and 3.3.2).

4.1.5    February 18, 2016 appears to be the first indication of Weyerhaeuser's awareness that formaldehyde emissions will be a concern with the planned development of the Flak Jacket® GEN-4 Protection and in the following weeks, the first in a continuing series of Proposed Protocols for testing formaldehyde emissions was issued (see Item 3.3.3, 3.3.4 and 3.3.5).

4.1.6    During the development phase of the TJI® Joists with Flak Jacket® GEN-4 Protection, the technical staff of Weyerhaeuser's TJI® Joist group acknowledged an awareness of formaldehyde legislation and the benefit of having the in-house capability to test for formaldehyde emissions using the ASTM's Small Chamber test (see Item 3.3.6).

4.1.7    Weyerhaeuser provided false information to the paint production and coating facility during air quality permitting for the Flak Jacket® GEN-4 production (see Item 3.3.7).

4.1.8    Weyerhaeuser's requirements for compliance to CARB formaldehyde emission regulations were set forth to the technical staff five (5) months before the TJI® Joists with Flak Jacket® GEN-4 Protection were first produced and at a time when formaldehyde tests on the on the product were not yielding favorable results (see Item 3.3.9).

4.1.9    Weyerhaeuser's prior experience with consumer complaints necessitated a proclamation by the technical staff to avoid odor problems during the development of the TJI® Joists with Flak Jacket® GEN-4 Protection (see Item 3.3.10).

4.1.10   Weyerhaeuser's efforts between July and September 2016 to formulate a CARB complaint formaldehyde absorbing topcoat as part of the Flak Jacket® GEN-4 Protection paint system was determined to be a failure (see Items 3.3.11, 3.3.12, 3.3.13, and 3.3. 14).

4.1.11   Three months before the onset of the GEN-4 TJI® Joist production, Weyerhaeuser exhausted its budget for developing a CARB compliant formaldehyde-free joist and elected to continue with joist production without regard to minimizing the formaldehyde emissions (see Item 3.3.15).

4.1.12   Weyerhaeuser's Regulatory Affairs Manager had inquired about formaldehyde emissions a month prior to the onset of production; however, no information regarding the outcome of that inquiry was found (see Item 3.3.16).

4.1.13   One month before the onset of the GEN-4 TJI® joist production, the technical staff was aware and still struggling with the issue of odors (see Item 3.3.17 and Item 3.3.18).

4.1.14   Three weeks before the onset of the GEN-4 TJI® joist production, the technical staff acknowledged that questions regarding the formaldehyde emission have still not been answered and elected to omit the issue from the FAQ section of the product's Technical Bulletin (see Item 3.3.19).

**Plaintiff's v. Weyerhaeuser Company**
US District Court for The District of Colorado
JENSEN HUGHES File No. 1A3171001

P a g e | 20
17-cv-02230-PAB-MEH
December 12, 2018

4.1.15    At the time the first production run of the TJI® Joists with Flak Jacket® GEN-4 Protection, Weyerhaeuser was considering the possibility of finding a more convenient and less expensive supplier of the additive used to reduce formaldehyde emissions in the joist product (see Item 3.3.20).

4.1.16    Weyerhaeuser's awareness of the excessive formaldehyde emissions and their failure to address the issue prior to production of TJI® Joists with Flak Jacket® GEN-4 Protection appears to be in violation 15 U.S. Code §1263- *Prohibited Acts* (see 3.2.4).

4.1.17    The subject TJI® Joists with Flak Jacket® GEN-4 Protection joists were first shipped to homebuilders for the construction of homes on or about on December 7, 2016 (see Item 3.3.19).

4.1.18    Weyerhaeuser acknowledged again that TJI® Joists with Flak Jacket® GEN-4 Protection contained formaldehyde at the time the product was first produced (see Item 3.3.21).

4.1.19    Weyerhaeuser's rush to production and failure to fully test the performance and quality of the TJI® Joists with Flak Jacket® GEN-4 Protection not only resulted in the formaldehyde emissions but several months of other post-production problems that required modifying the paint formula and application methods (see Item 3.3.22 and 3.3.29).

4.1.20    Weyerhaeuser's made false claims on the SDS stating that the Flak Jacket® GEN-4 Protection product has been evaluated for formaldehyde emission rates and was determined to be safe (see Items 3.3.23, 3.3.24, 3.3.31 and 3.3.43).

4.1.21    The technical staff of Weyerhaeuser's TJI® Joist group acknowledged that formaldehyde is carcinogenic (see Item 3.3.23).

4.1.22    Production and performance problems with the TJI® Joists with Flak Jacket® GEN-4 Protection suggest the product was not properly tested prior to production (see Items 3.3.22 and 3.3.25).

4.1.23    The failure of Weyerhaeuser to fully test the prototype performance of its fire inhibiting paint system resulted in the distribution of a defective and dangerous product (see Items 3.3.22 3.3.23, 3.3.25, 3.3.27 and 3.3.29).

4.1.24    Weyerhaeuser technical staff was aware that the TJI® Joists with Flak Jacket® GEN-4 Protection were emitting formaldehyde levels that exceeded CARB regulations for more than a month after first production runs were being produced (see Item 3.3.26 and 3.3.27).

4.1.25    At the time Weyerhaeuser was first informed about the irritant odors on April 29, 2017, the technical staff was aware that the odors from TJI® Joists with Flak Jacket® GEN-4 Protection were formaldehyde emissions (see Item 3.3.30, 3.3.31 and 3.3.34).

4.1.26    In early May of 2017, Weyerhaeuser's technical staff made its first efforts to address the formaldehyde odors on installed products and on future production runs and proceeded with the development of a formaldehyde scavenging remediation field paint (see Item 3.3.31 3.3.32, 3.3.33 and 3.3.34).

**Plaintiff's v. Weyerhaeuser Company**
US District Court for The District of Colorado
JENSEN HUGHES File No. 1A3171001

P a g e | 21
17-cv-02230-PAB-MEH
December 12, 2018

4.1.27   Weyerhaeuser answered the pleas of an inquiring homebuilder with a deceptive and unfounded explanation regarding the odors (see Item 3.3.35 and 3.3.37).

4.1.28   Weyerhaeuser was aware of the formaldehyde emission problem at least one month prior to first move-in date of the Colorado claimants (see Item 3.3.36).

4.1.29   The last of the Colorado claimants were permitted to move into an affected home two and half months after Weyerhaeuser first became aware of the formaldehyde emissions in Colorado homes (see Item 3.3.36).

4.1.30   Weyerhaeuser produced the first batch of the remediation Field Paint on June 13, 2017. The Field Paint, which has a formula like the Flak Jacket® GEN-4 topcoat, is intended to provide an additional layer of formaldehyde scavenging paint (see Item 3.3.40).

4.1.31   On June 7, 2017 Weyerhaeuser marked the day that its modifications to base coat formula finally passed the first CARB compliant formaldehyde tests (see 3.3.38).

4.1.32   Weyerhaeuser did not issue a public news release until July 18, 2018, having permitted consumers in Colorado to continue using and being exposed to the defective and dangerous product for over two months after first becoming aware of the formaldehyde emissions (see Item 3.3.41 and 3.3.42).

4.1.33   Between July and December 2017, Weyerhaeuser utilized research and development services of third party laboratory to test the ability of the W20115 to scavenge formaldehyde emissions from remediated joists over a period of three to four months. (see 3.3.43 and 3.3.44).

4.1.34   No evidence was found to indicate that the W20115 Remediation Field Paint would inhibit formaldehyde emissions beyond three to four months (see 3.3.44).

4.1.35   The latex topcoat on the joists and remediation Field Paint are similar formulations that utilized melamine powder to react with and reduce formaldehyde emissions from the base coat (see item 3.3.46, 3.4.2 and 4.3.3).

4.1.36   Melamine powder used in the top coat formulas can react with formaldehyde to form non-vapor-forming melamine formaldehyde, however the reaction is limited by concentration of the reactant and concentration of formaldehyde gas (see item 3.4.2 and 3.3.12).

4.1.37   Prior to production of the joists, Weyerhaeuser failed to test formula prototypes for formaldehyde emissions, and test the time weighted performance tests of the melamine powder reactant that would have been required to assure the absence of product emissions (see item 3.4.2).

4.1.38   Weyerhaeuser's use of melamine powder in the original top coat formulation further substantiates prior knowledge of formaldehyde emissions from the base coat (see item 3.4.2).

**Plaintiff's v. Weyerhaeuser Company**                                    P a g e  | 22
US District Court for The District of Colorado                            17-cv-02230-PAB-MEH
JENSEN HUGHES File No. 1A3171001                                          December 12, 2018

4.1.39   The subject TJI Joists with Flak Jacket GEN-4 Protection were placed into the stream of commerce by Weyerhaeuser in a defective condition that created an unreasonable danger to consumers and violated federal statutes (see Item 3.2.4).

4.1.40   Weyerhaeuser failed to adequately warn homebuilders, distributors and homeowners of the dangers associated with the off-gassing of formaldehyde from the subject TJI Joists with Flak Jacket GEN-4 Protection.

4.1.41   Our document review did not uncover any information regarding the method or quality control data associated with the "small scale chamber" formaldehyde tests conducted by Weyerhaeuser's Columbia Falls, Montana MDF plant.

4.1.42   Our document review did not uncover formula information for the W20115 Field Paint used in the remediation (see Item 3.3.46).

4.1.43   Our document review did not reveal information regarding production records that would show corresponding any combinations or changes in the paint formulas that were used.

**Plaintiff's v. Weyerhaeuser Company**                                          P a g e | 23
US District Court for The District of Colorado                           17-cv-02230-PAB-MEH
JENSEN HUGHES File No. 1A3171001                                          December 12, 2018

## 5.0   CURRICULUM VITAE

### SUMMARY

Warren Harris is a Senior Forensic Chemist with a background in chemistry, geology and mechanics. He specializes in laboratory characterization of unknowns, and their potential sources, including chemical analysis of fire debris. As a Senior Forensic Chemist, he has conducted laboratory investigations designed to determine the causation of failures involving manufacturing processes, consumer products, materials and construction systems. Specific forensic analyses include identifying the chemical properties of various types of products, and determining the cause of failures in materials such as adhesives, paints, coatings, concretes, plastics, metals (corrosion), wood, plaster, glass textiles, fluids, oils and other materials.

Prior to his collegiate studies, Mr. Harris was employed as an auto mechanic with the U.S. Army Transportation Motor Pool where he gained extensive knowledge about vehicle systems and components. Additionally, he has received specialized training for investigative Locksmithing to perform forensic analysis of keys and locks.

Mr. Harris' approach to forensic investigations combines his experiences and skills obtained in evidence collection, literary research and specialized laboratory techniques to determine causes of material failures. He has a working knowledge of most scientific instrumentation, wet chemical, microscopy and spectroscopic techniques. Mr. Harris provides testing, consulting, and expert witness testimony.

### EDUCATION

**Eastern New Mexico University,** Bachelor of Science, Geology and Chemistry, 1990
**University of Maryland,** Associate of Arts in Geology, 1985

### LICENSES, CERTIFICATIONS AND REGISTRATIONS

**Licensed Unarmed Private Investigator,** Washington, No. 2782

### PROFESSIONAL EXPERIENCE

**CASE Forensics, a Jensen Hughes Company,** Mountlake Terrace, WA, 2005 to present
Senior Forensic Chemist
Senior Forensic Chemist skilled in providing analytical support services including laboratory characterization and identification of unknown materials, deposits and residues. Conducts laboratory investigations designed to determine the cause of failures involving processes, consumer products, materials and construction systems. Specific forensic investigations include determining the cause of failure of adhesives, coatings, concretes, plastics, metals, woods and other materials. Operation of scientific instruments includes gas chromatography (GC), Fourier Transform Infrared Spectroscopy (FTIR) and microscopy. Provides expert witness testimony.

**PSI (formally Pacific Testing Laboratories),** Seattle, WA, 1991 to 2005
*Senior Forensic Chemist*
Senior Forensic Chemist. Performed numerous failure analyses, coating characterizations and consulted on existing and proposed coatings systems. Performed forensic failure investigation of a name brand ceiling tile adhesive resulting in a nationwide alteration in the application. Determined failure characterization and consulted on the corrosive failure of hollow metal door frames. Identified the causation of several violent explosions associated with industrial surge protection units. Performed coating inspection and forensic consulting for failure on 85,000 square feet of hangar roofs. Designed and performed a forensic investigation associated with the failed liner system of a 14 million-gallon anaerobic waste digester. Provided expert witness testimony.

### ADDITIONAL SKILLS AND EXPERTISE

**Microscopy**
25 years of experience using incident, transmitted and polarized light microscopy. Experience also includes micro-measurements and photography. Other skills include specimen preparation and micro-chemistry techniques as well characterization and identification of particulate matter, fibers and physical tool marks.

**Fourier Transform Infrared Spectroscopy (FTIR)**
over 25 years of experience in qualitative analysis of organic and inorganic materials through working knowledge of sample preparation and extraction techniques and subsequent interpretation and comparative matching of FTIR spectra.

**Plaintiff's v. Weyerhaeuser Company**
US District Court for The District of Colorado
JENSEN HUGHES File No. 1A3171001

P a g e | 24
17-cv-02230-PAB-MEH
December 12, 2018

**6.0    TESTIMONY LIST**

| Deposition | Arbitration | Trial | Court | Case Caption |
|---|---|---|---|---|
| 9/28/18 | | | State of Hawaii | Association of Apartment Owners of One Waterfront Towers v Color Dynamics Inc \| Color Dynamics Inc v Tile Accents LLC |
| | | 7/30/2018 | Superior Court of WA, Snohomish County | Christine Lapinski v. Westhill Restoration Inc aka Westhill Integrated Home Improvement v. BTL Engineering PS; Loberg Roofing and Construction Inc; PPS Heating and Air Conditioning Inc; Quality Plus Insulation Inc; DR Construction & Drywall Inc; Blair Painting Inc. No.: 15 2 03063 7 |
| 2/12/18 | | | US District Court of Eastern WA | Johnson Foods Inc. v. Letica Corporation No. 1:16-cv-03197-LRS |
| | | 07/25/2017 | Superior Court of WA, King County | Jeff & Elaine McNabb v. Metropolitan Property & Casualty Insurance Company, et al. |
| 01/17/2017 | | | Superior Court of WA, King County | Jeff & Elaine McNabb v. Metropolitan Property & Casualty Insurance Company, Allied Restoration Inc., dba ServPro of Central Seattle & Taylor & Smith LLC dba PWC Construction Case No. 14-2-30953-8 SEA |
| 01/22/2015 | | | Superior Court of WA | Jones v TNT Fireworks No. 12-2-39641 SEA |
| 2/18/2014 | | | Superior Court of WA, Kittitas County | McBride Construction Resources Inc v. Timothy & Kerry Mushkin & Gold Canyon Inc dba MM Wood Restoration & Protection, Eric Hohmann dba Straight Arrow Northwest, Straight Arrow Northwest Inc & Greg Anderson dba Greg Anderson Painting v State Farm Fire & Casualty Co v. Saul & Jane Doe Aramba;12-2-00264-1 |
| | | 02/5/2014 | District Court of WA, Eastern District, Spokane | Joe Selliken v. Country Mutual Ins. Co; 2:12-CY-00515-TOR |
| 08/29/2013 | | | District Court of ID, *Caribou Co* | Nu-West Industries Inc v. Capstone Process Systems LLC; 4:11-CV-00299-BLW |
| | | 11/26/2012 | Superior Court of WA, Pierce Co | Canterbury Apartment Homes LLC v. Louisiana Pacific Corp; 11-2-15698-8 |

**Plaintiff's v. Weyerhaeuser Company**
US District Court for The District of Colorado
JENSEN HUGHES File No. 1A3171001

P a g e | 25
17-cv-02230-PAB-MEH
December 12, 2018

## 7.0   TRIAL EXHIBITS

All provided discovery responses and cited information.

## 8.0   COST OF JENSEN HUGHES' INVESTIGATION

JENSEN HUGHES charges $240.00 per hour for investigations provided by Warren F. Harris.  Deposition and testimony are 1.5 times his hourly fee. Other fees and charges are in accordance with JENSEN HUGHES Standard Terms and Conditions and Fee Schedule.