**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-02230-PAB-MEH

JANET CHI, individually and on behalf of minor child, J.C.,
DAVID CHI, individually and on behalf of minor child, J.C.,
WEN-CHENG CHI,
SHIU-SHIA WU,
SHASHI RAJYAGOR, individually and on behalf of minor children, A.R. and S.R.,
DIVYESH RAJYAGOR, individually and on behalf of minor children, A.R. and S.R.,
NEAL LOY,
BRIENNE LOY,
ANTERIO KITTRELL, and
JOELLA KITTRELL,

    Plaintiffs,

v.

WEYERHAEUSER COMPANY,
WEYERHAEUSER NR COMPANY,

    Defendants.

## DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF ROBERT MYERS

Defendants Weyerhaeuser Company and Weyerhaeuser NR Company (collectively, "Weyerhaeuser") respectfully move to exclude the testimony of Robert Myers, who has prepared reports purporting to quantify a portion of the damages claimed by the plaintiffs in this litigation. Mr. Myers's opinions do not satisfy the threshold requirements for admission of expert testimony under Federal Rule of Evidence 702 and *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny.

Mr. Myers opines that the value of houses manufactured with TJI Joists Generation 4 Flak Jacket Protection (the "Joists") will be reduced because of "stigma" by 5%, 10%, or 15%—even following remediation—depending on the remediation method used. *See* 8052 S. Valleyhead Way

1

Report ("Chi Report") at 10 (attached as Exhibit A); 6755 S. Robertsdale Way Report ("Rajyagor Report") at 10 (attached as Exhibit B); 670 Dry Creek Place Report ("Loy Report") at 11–12 (attached as Exhibit C). Based on these percentages, he further opines that: the Chi plaintiffs have suffered stigma damages in the amount of 10% of their home's value, which he qualifies as $64,500, *see* Chi Report at 10; the Rajyagor plaintiffs have suffered stigma damages in the amount of 15% of their home's value, which he quantifies as $108,000, *see* Rajyagor Report at 10; and the Loy plaintiffs have suffered stigma damages in the amount of 7.5% of their home's value, which he qualifies as $48,750, *see* Loy Report at 12.

Mr. Myers collected the data supposedly underlying these opinions through informal discussions with other real estate professionals and an online survey proposed by one of his daughters, neither of which provides a reliable basis for an expert opinion. And the conclusions that he reaches have no discernible connection to the underlying data; they rest instead on a so-called "qualitative analysis" in which "the numbers are coincidental." Myers Dep. 288:23–24 (attached as Exhibit D). That, too, is not a reliable basis for forming an expert opinion.

**I.     BACKGROUND**

Mr. Myers asserts that "the subject property"—that is, a house constructed with the Joists—"would be marketable after remediation, but most likely at a lower price than a competitive home that had not suffered the same issues." Chi Report at 6; Rajyagor Report at 6; Loy Report at 8. "The challenge," he admits, "is to estimate the amount of [this] stigma and reduce it to a dollar or percentage amount." Chi Report at 5; Rajyagor Report at 5; Loy Report at 7.

Because, in his view, "there are not a statistically reliable number of sales of homes post-remediation . . . to compare to the sales of similar unaffected homes," Mr. Myers did not employ

the "[m]ost reliable" method for quantifying stigma: "paired sales analysis or sale-resale analysis." Chi Report at 6; Rajyagor Report at 6; Loy Report at 8. Instead, he used a "survey and interview" method to obtain information from other real estate professionals. *See ibid.*

*First*, Mr. Myers spoke with approximately 40 appraisers who were taking real estate classes that he taught, *see* Myers Dep. 225:9–14, 225:20–22, as well as approximately 10 real estate brokers that he knew through professional connections, *see id.* at 225:15–19, 225:23–226:1. Mr. Myers did not take any notes about these conversations, *see id.* at 227:15–22, and he does not claim to have relied on them in quantifying the effect of stigma on the relevant houses, *see id.* at 227:23–228:2, 229:1–230:5.

*Second*, Mr. Myers solicited responses from real estate brokers to a 21-question online survey. *See* Myers Dep. Exs. 336–337 (survey and results; attached as Exhibits E and F). Although his daughters were not retained to provide expert testimony in this matter, *see* Myers Dep. 238:10–12, they assisted in developing the survey: One daughter recommended conducting the inquiry through an online service named Survey Monkey, *see id.* at 237:8–12, 238:17–19, and both daughters assisted Mr. Myers in developing questions that they believed were appropriate in evaluating stigma, *see id.* at 238:5–9. Using a distribution list of Board of Realtors members compiled by Front Range 360, *see id.* at 240:1–19, the survey was distributed to "a thousand or more" real estate brokers, *see id.* at 240:20–23. Mr. Myers received 102 responses, *see id.* at 241:5–8, many of which declined to answer all of the questions or did not finish the survey, *see id.* at 273:13–22, 283:8–9. Among other things, the survey asked the respondents whether they would anticipate "market resistance to the home" if they were acting as the listing agent, Myers

3

Dep. Ex. 336, at 7–8, and how they would advise potential buyers if it were disclosed that the house had been remediated in a particular way, *see id.* at 9–10.

Although the surveys did not ask the respondents to assign a specific amount or percentage to the stigma, Mr. Myers calculated that a "typical buyer" would pay 5% less for a house where the Joists had been replaced; 10% less where the Flak Jacket had been mechanically removed from the Joists; and 15% less where the floor joists had been remediated using the W20115 field paint. Chi Report at 10; Rajyagor Report at 10; Loy Report at 11–12. And where, as in the Loy's case, the floor system was partially replaced, Mr. Myers "estimate[d]" a 7.5% reduction in value on the theory that "market . . . impact would be greater than a full floor joist replacement but less than a mechanical removal of the formaldehyde." Loy Report at 12. During his deposition, Mr. Myers stated that these percentages were not derived from the survey responses but rather that the responses were "factors" that he took "into consideration" in assessing stigma based on his "professional experience" and "feel of the marketplace." Myers Dep. 288:23–289:2.

## II.   ARGUMENT

### A.   Mr. Myers's Data-Collection Methods Were Not Reliable.

Using a so-called "survey and interview" approach, Mr. Myers "had discussions with respect to formaldehyde stigma in . . . recent appraisal classes in which [he] was the instructor" and "conducted a survey of real estate brokers in the Denver Metropolitan area to determine the knowledge and reaction to the formaldehyde issue." Chi Report at 6–7; Rajyagor Report at 6–7; Loy Report at 8. As discussed below, Mr. Myers did not meaningfully rely on these conversations and the survey in assigning percentage-based price adjustments based on stigma. But even if he

4

had done so, the resulting opinions would not have been "based on sufficient facts or data" or "the product of reliable principles and methods." Fed. R. Evid. 702(b)–(c).

As an initial matter, Mr. Myers cannot properly base his expert opinions on conversations with appraisers or other industry professionals. According to Mr. Myers, he interviewed approximately 40 appraisers who were students in his classes, *see* Myers Dep. 225:11–14, 225:20–22, as well as 10 brokers that he knew through the real estate professional community, *see id.* at 225:15–17, 225:23–226:1. It is impossible to evaluate any information that Mr. Myers might have learned from these discussions because he did not record any notes from them. *See id.* at 227:15–17. But it is well-settled in any event that "anecdotes from a handful of personal conversations" are "not sufficient facts and data to support [an expert's] conclusions." *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1026 (10th Cir. 2002). Mr. Myers appeared to concede as much in his deposition, acknowledging that he did not "rely on the interviews in determining the amount of [his] stigma calculations." Myers Dep. 227:23–228:2; *see also id.* at 229:1–9 (acknowledging that information obtained in the conversations does not "correlate . . . to the calculation of the amount of the stigma damages").

The only remaining "facts or data" underlying Mr. Myers's opinions are the survey responses that he received from other real estate professionals. But Mr. Myers's survey methodology is plagued by flaws that prevent him from reliably drawing any conclusions from the survey.

At his daughter's suggestion, Mr. Myers conducted the survey through a service named Survey Monkey. *See* Myers Dep. 236:25–237:12, 238:17–19. Another company—Front Range 360—distributed Survey Monkey's survey to an e-mail distribution list containing Denver-area

5

Board of Realtors members. *See id.* at 238:24–239:6, 240:15–23. According to Mr. Myers, he "think[s]" that the number of survey recipients was "a thousand or more," *id.* at 240:22, and he received 102 responses, *see id.* at 231:8.

Many of the responses were incomplete, *see*, *e.g.*, Myers Dep. 283:6–8 ("It's pretty consistent through the whole survey . . . that many people didn't answer."), and "maybe 30 people started the survey and didn't finish it," *id.* at 283:8–9. But even crediting Mr. Myers's own estimation of the response rate, he "got about a 10 percent response." *Id.* at 241:7. Such a low response rate creates a significant risk of "nonresponse bias"—that is, "[s]ystemic error created by differences between respondents and nonrespondents." Federal Judicial Center, *Reference Manual on Scientific Evidence* 290 (3d ed. 2011). "People who do not respond to a survey are usually different from respondents," and a high nonresponse rate suggests that "this bias may be severe." *Ibid.* But while there are "a variety of approaches to adjust for nonresponse," *id.* at 384, Mr. Myers did not employ any of them, *see* Myers Dep. 276:6–9.

The likelihood of nonresponse bias in Mr. Myers's survey is compounded by the fact that even the small number of responses he received demonstrated significant differences among respondents. Survey Monkey allowed individuals to include comments along with their responses, *see* Myers Dep. 262:10–12, which were reported to Mr. Myers, *see id.* at 262:13–15. Some of the comments call into question whether the individual believed that any adverse effect on home value could be attributable to Weyerhaeuser. *See id.* at 263:2–3 ("'The problem is not with . . . Weyerhaeuser, it's with the new home builder."). Moreover, as Mr. Myers has acknowledged, "if you take the time to make a comment after you've taken one of these surveys, you've probably got some emotional bias or . . . more than typical emotional response." *Id.* at 263:13–17. But

6

while he acknowledged that it might have been "useful to associate comments with particular results," *id.* at 268:14–17, he did not make any attempt to measure or correct for likely bias in his survey results.

Nor did Mr. Myers take appropriate steps to ensure that the responses he received were from the brokers whose opinions he believed to be relevant. One of the survey questions asked, for example, whether the respondent practiced real estate in the Colorado counties at issue. *See* Myers Dep. Ex. 336, at 2. Mr. Myers explained that he "wanted to have people in the area that worked within the counties that were affected," and therefore asked in the survey "whether they worked in these particular areas or they had experience in these areas." Myers Dep. 239:7–12. That sort of question might be an appropriate step "to make sure that [he] was getting a reasonable sample of responses from across the brokerage community." *Id.* at 239:20–22. But while several individuals indicated that they did not practice real estate in the relevant counties, *see* Myers Dep. Ex. 336, at 2, Mr. Myers did not exclude their responses from his results, *see* Myers Dep. 270:6–9. His explanation for failing to do so—that he "had no way" of "know[ing] what their answers are" because Survey Monkey did not provide respondent-by-respondent survey responses, *id.* at 270:11–12—simply emphasizes that he departed from standard methodology.

The same is true for the respondents' level of real estate experience. Mr. Myers included a question about experience but was unable to assign different weights to other answers based on experience because he did not obtain the necessary information from Survey Monkey to correlate the answers to a particular respondent. *See* Myers Dep. 259:7–10 ("I don't know who responded to what. So I don't, for instance, know that a 15-year veteran's response was different than five years."). Rather than ignore experience altogether, however, Mr. Myers decided to give "more

7

weight to the reliability of the overall survey based on the relative age and experience of the respondents, than had they all been brand new people." *Id.* at 259:13–16. But he has not offered any statistical or other basis for concluding that, if an experienced respondent's answers are more reliable than an inexperienced respondent's, then the *entire* survey results can be deemed more reliable based on the *average* experience of the respondents as a whole—particularly without any comparison group against which to measure reliability.

Mr. Myers's choice of wording introduced an additional level of likely distortion in the survey responses he received: His wording departed from the standard practice of framing unbiased inquiries and instead suggested to the recipients that Weyerhaeuser was blameworthy. The fourth question in Mr. Myers's survey asked: "Are you aware that in 2016 and 2017, Weyerhaeuser Company supplied some new homes in your area with defective TGI [*sic*] floor truss systems that emitted formaldehyde, causing harm and injury to home owners in the area?" Myers Dep. Ex. 336, at 3. The assertion that the floor joists "caus[ed] harm and injury to home owners in the area" is a disputed factual contention in this and other proceedings, and Mr. Myers acknowledged that he was not "aware of any court ruling establishing that the TJI joists caused harm and injury to homeowners." Myers Dep. 272:18–22. Indeed, Mr. Myers has conceded that it would "probably" have been "correct form" to include qualifying language such as "allegation" or "alleged." *Id.* at 273:2–8.

The same is true for his repeated characterization of one method of remediation—applying a remediation paint that can chemically bind any formaldehyde that is off-gassed—as simply "painting over" the Joists, which he acknowledged could "possibl[y]" have biased the responses. *See id.* at 278:16–18. His explanation for this flaw in his approach—"[p]robably because I wasn't

8

thinking like a newspaper person," *id.* at 273:6–7—highlights rather than excuses his failure to follow accepted practice.

Yet even if Mr. Myers had avoided these serious methodological flaws, his survey still would not represent "reliable principles and methods" because he did not include any questions that would bear directly on the amount of any diminution in value. His seventh question asked, "If you are representing a buyer and knew the home was one of the affected houses that has been fixed would you advise" one of three options: "Offer the same as a similar house 1 block away that was not built with the recalled trust [*sic*] system," "Offer less than a similar house 1 block away that was not built with the recalled trust [*sic*] system," and "Don't make an offer on this house." Myers Dep. Ex. 336, at 4. Similarly, his fifteenth through seventeenth questions asked, "As a buyer agent, how would you advise your buyer, when it is disclosed, that there was a defective floor system that emitted dangerous levels of formaldehyde" that had been remediated in one of the three methods, offering the following responses: "The floor has been replaced [or fixed], it shouldn't be a problem," "You should consult outside experts to determine that the home is safe during the inspection period," "If you are comfortable with the solution were [*sic*] should make an offer a little lower than asking price," "If you are comfortable with the solution were [*sic*] should make an offer a somewhat lower than asking price," "If you are comfortable with the solution were [*sic*] should make an offer a significantly lower than asking price," and "I would advise that we find a different home." *Id.* at 9–11. And his eighteenth through twentieth questions asked, "As a buyer agent, how would you advise a buyer making an offer on an affected home that had the floor joists system" remediated in one of the three methods, offering the following responses: "This disclosure doesn't impact the value of the home," "We should offer less for the

9

home ($1,000 to $5,000)," "We should offer less for the home (3% to 5%)," "We should off [*sic*] less for the home (over 5%)," and "We should make a not offer on the home." *Id.* at 12–14.

Each of these questions seeks the respondent's recommendation as a real estate agent. But the fact that a real estate agent might recommend a pricing adjustment to a potential buyer—even if the amount could be determined for a particular home based on the generic information collected in the survey—does not reveal how the buyer would respond to that recommendation. To the contrary, Mr. Myers acknowledged that, although he "might advise [his] client as to a fair price," he would not "ever tell a client not to buy at a price if the client wanted to buy at the price." Myers Dep. 232:21–25; *see also id.* at 233:3–5 ("I let the buyer buy, which is why I'm still in business after 40 years."). The survey does not ask whether, in the respondents' experience, their clients would likely offer less and, if so, by what amount.

The same problem applies to Mr. Myers's twelfth through fourteenth questions, which ask whether the respondent "[a]s the listing agent" would expect "market resistance to the home" if it had been remediated in one of the three methods. Myers Dep. Ex. 336, at 7–8. His proposed responses—"No impact," "Small impact," "Moderate Impact," and "Significant market reaction," *ibid.*—do not attempt to determine what the actual impact on price might be and, in any event, leave the reader to guess what particular respondents might have judged to be "Small," "Moderate," or "Significant." To the extent that the information obtained through these questions has any use at all, that use is decidedly not in calculating the amount by which the value of a given house (or even all houses where a particular remediation method was used) has been reduced.

At most, Mr. Myers's approach would support a subjective ranking of the stigma damages associated with different remediation methods. He stated that, "in a case where 50 percent of the

10

brokers say, I will not sell this property at any price," he would assign his "highest damage estimate" to the remediation method at issue because it prompted "the strongest market reaction" "relative to the other methods of . . . remediation." Myers Dep. 229:10–17. But even if it were possible to evaluate the "strength of the reactions" (*id.* at 228:1–2) in such an "I know it when I see it" manner, that comparative exercise does nothing to establish the particular amount that any home's value decreased as a result of stigma.

*   *   *

As Mr. Myers acknowledged in his deposition, this was the first time that he had "done an e-mail distribution survey . . . for [his] professional work," Myers Dep. 244:18–20, and he admittedly did not "loo[k] to any reference materials or guidance on how to conduct a valid survey." *Id.* at 238:13–16. Mr. Myers claims to have relied on his "general understanding of . . . conducting surveys" that "you attempt . . . to extract information that's . . . meaningful to . . . the situation." *Id.* at 237:17–21. But even he appears to have recognized that his "general understanding" was insufficient, as he "went through the questions with . . . both of my daughters to see if they saw anything that appeared to be biased and felt the questions were fair for what I was trying to determine." *Id.* at 237:5–9. Under the circumstances, it is perhaps understandable that Mr. Myers's attempt to survey real estate agents fell far short of acceptable survey practice. As a result, however, the survey data that form the sole non-anecdotal bases for his opinions are not "the product of reliable principles and methods," and therefore are not admissible under Rule 702 and *Daubert*.

### B. Mr. Myers Lacks Any Reliable Methodology For Converting His Survey Data Into Specific Conclusions About Diminished Property Values.

Even if Mr. Myers had properly collected the survey data underlying his opinions, the opinions nonetheless would be inadmissible because he has not offered any methodology for translating the survey data into specific measurements of diminished property values. The percentages that he offers as a measure of stigma damages therefore are not "the product of reliable principles and methods." Fed. R. Evid. 702(c).

According to Mr. Myers, the reduction in value associated with stigma would depend on the particular remediation method. He opines that "a typical buyer would purchase the home after an approximate 5% adjustment in price if the floor system was successfully replaced," "a typical buyer would purchase the home after an approximate 10% adjustment in price, if the floor system was successfully mechanically treated," and "a typical buyer would purchase the home after an approximate 15% adjustment in price, if the floor system was painted over." Chi Report at 10; Rajyagor Report at 10; Loy Report at 11–12. For "partial removal of the floor systems"—a remediation method not covered by his survey—Mr. Myers "estimate[d] that market . . . impact of this remediation technique would be greater than a full floor joist replacement but less than a mechanical removal of the formaldehyde." Loy Report at 12. Apparently averaging his estimates for the latter remediation techniques, Mr. Myers assigned a reduction of 7.5% to partial removal of the floor systems. *See ibid.* These percentages have no connection to the survey responses that he received.

For the 15% figure, which reflects the paint-based method of remediation, Mr. Myers states that "82.35% indicated that the reduction in value would be from 3% to not making an offer on the home at any price, with 73.53% indicating a higher than 5% price impact." Chi Report at 10;

12

Rajyagor Report at 10; Loy Report at 11–12. For the 10% figure, which reflects the mechanical treatment method of remediation, Mr. Myers states that "70.00% [of respondents] indicated that the reduction in value would be from 3% to not making an offer on the home at any price, with 48.57% indicating a higher than 5% price impact." *Ibid.* For the 5% figure, which reflects replacement of the floor system, Mr. Myers states that "40.47% [of respondents] indicated that the reduction in value would be from 3% to not making an offer on the home at any price." *Ibid.*

But Mr. Myers does not explain how he could translate such divergent responses into a single—supposedly "typical"—percentage that represents reduction in value. Nor does he explain how he could translate these survey responses, which nowhere suggest a 5%, 10%, or 15% reduction in value, into a reliable conclusion that the "typical" buyer would insist on those reductions. And there is even less of a basis for Mr. Myers to translate those reductions into a 7.5% average reduction for partial removal of the floor system—a remediation method that he admits was not addressed in his survey. *See* Myers Dep. 287:3–11. Indeed, his survey questions all but assured that it would be impossible to perform such an analysis: Respondents who stated that they would recommend an offer reduced by more than 5% had no way to indicate whether they envisioned a 6% reduction, a 99% reduction, or somewhere in between. *See* Myers Dep. 284:19–21 ("It goes from . . . over 5 percent . . . to a hundred percent [*i.e.*, no offer]").

Significantly, Mr. Myers has disclaimed any attempt to link his survey results to the opinions he offers. *See* Myers Dep. 288:23–289:2 ("It's just the numbers are coincidental. It's . . . a qualitative analysis, and I've based my opinion on my professional experience and my feel of the marketplace taking all of these factors into consideration."). In his deposition, he testified that, while he was "weighing all of those responses [in informal discussions], and the responses

13

from the survey," "it's not a scientific calculation, it's my interpretation of the data and all of the information that I've gotten, what it tells me." *Id.* at 229:4–9.  That is, Mr. Myers claims to have "weighed th[e] information" that he obtained in the survey—through some unstated and untestable means—"to reach an opinion of value with my general knowledge of the market." *Id.* at 156:19–21.

Mr. Myers's assertion that he performed a "qualitative analysis" (Myers Dep. 288:19–20) that "tr[ied] to balance everything" (*id.* at 156:22) is just another way of saying that he did not derive his stigma opinions from the survey data that he collected.  *See id.* at 237:21–23 ("It gives me information that I can weigh in—to formulate my own opinion . . . ."); *id.* at 263:21–24 ("I have used the total of my experience and professional judgment to render an opinion.  This is all part of the data that I used.").  But putative experts cannot "escape screening . . . simply by stating that their conclusions were not reached by any particular method or technique." *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 991 (5th Cir. 1997).  Instead, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  That is precisely the case here.

## III.    CONCLUSION

For the foregoing reasons, Weyerhaeuser respectfully submits that the proposed expert testimony of Robert Myers should be excluded in this case under Rule 702 and *Daubert*.

DATED this 24th day of May, 2019

Respectfully submitted,

**PERKINS COIE LLP**

By: *s/ Craig M.J. Allely*
Craig M. J. Allely, #17546
CAllely@perkinscoie.com
Michael A. Sink, #36064
MSink@perkinscoie.com
Daniel Graham, #45185
DGraham@perkinscoie.com
Lindsey E. Dunn, # 49547
LDunn@perkinscoie.com
Marcus A. Haggard, #50388
MHaggard@perkinscoie.com
1900 Sixteenth Street, Suite 1400
Denver, CO  80202-5255
Telephone:  303.291.2300
Facsimile:  303.291.2400

Daniel P. Ridlon, WSBA #37927
DRidlon@perkinscoie.com
Leigh E. Sylvan, WSBA #52415
LSylvan@perkinscoie.com
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000

**Attorneys for Defendants,
WEYERHAEUSER COMPANY
WEYERHAEUSER NR COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that on May 24, 2019, I electronically served a copy of this motion on counsel for plaintiffs at the following e-mail addresses:

Mark W. Nelson, Esq.
mark@nelsonlawfirm.net

Colleen S. Nelson, Esq.
colleen@nelsonlawfirm.net

Jeffrey Scott Sweeney
scott@nelsonlawfirm.net

By: *s/ Craig M. J. Allely*
Craig M. J. Allely
CAllely@perkinscoie.com
1900 Sixteenth Street, Suite 1400
Denver, CO 80202-5255
Telephone: 303.291.2300
Facsimile: 303.291.2400

**Attorney for Defendant,
WEYERHAEUSER COMPANY**